# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| PABLO TORREZ, | ) | CASE NO. 1:10-cv-00576 |
| | ) | |
| Petitioner, | ) | JUDGE DONALD C. NUGENT |
| | ) | |
| v. | ) | MAGISTRATE JUDGE GREG WHITE |
| | ) | |
| RICHARD GANSHEIMER, Warden | ) | |
| | ) | |
| Respondent. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

Petitioner, Pablo Torrez ("Torrez"), challenges the constitutionality of his conviction in

the case of *State v. Torrez*, Cuyahoga County Court of Common Pleas Case No. CR-90-257736.

Torrez, *pro se*, filed a Writ of Habeas Corpus (ECF No. 1) pursuant to 28 U.S.C. § 2254 on

March 17, 2010.  On August 19, 2010, Warden Richard Gansheimer ("Respondent") filed a

Motion to Dismiss the Habeas Petition as Time-Barred.  (ECF No. 8.)  On October 13, 2010,

Torrez filed a response asserting actual innocence.  (ECF No. 14.)  The Court appointed the

Federal Public Defender to represent Torrez.  (ECF No. 15.)  On January 20, 2011, oral

arguments concerning Respondent's motion to dismiss the petition as time-barred were heard.

The same day, this Court granted Torrez's previously filed Motion for an Evidentiary Hearing.[1]

---

[1] This Court found that "given the unique circumstances presented in this case, an
evidentiary hearing was needed to address whether Torrez's actual innocence claim is
credible and would provide a gateway allowing for his petition to be considered on the

(ECF Nos. 7, 21.)

After some limited discovery, the Court held an evidentiary hearing on July 21 and 22, 2011.[2]  (ECF Nos. 71, 73.)  Being fully briefed, Respondent's motion to dismiss is before the Court.

## I.  State Court's Summary of the Facts

The state appellate court summarized the facts underlying Torrez's conviction as follows:

> On that day, Miguel Colton, Derrick Turner (a.k.a. "Bear"), Alphonso Alescia and the victim, Brian Owens (a.k.a. "Zone"), all members of a gang known as the "Folks," met at a friend's house on W. 81st Street near Madison Avenue in Cleveland to lift weights.

> At approximately 6:00 p.m., a girl known to them as "Smurf" appeared at the house and notified them that some members of a rival gang were "tagging" in their neighborhood.  The Folks members understood this to mean that the rival gang's members were putting graffiti "disrespectful" of their gang on a wall.  The Folks decided to investigate the report.

> As they left the house, they walked northward on W. 81st Street. From their vantage point, they saw W. 81st Street's intersection with Madison Avenue and observed two men, later identified as Jose "Chaz" Mercado and appellant, spray painting a wall of one of the buildings located there.  Mercado and appellant were putting symbols on the wall which indicated their names, their gang affiliation, and the words "Folks Killers."  As the four Folks continued to walk toward them, Mercado and appellant stopped what they were doing and ran, disappearing from view.

> The four Folks began to cross W. 81st as they approached Guthrie Avenue, a side street just south of Madison.  The victim, Owens, was close to the west side of the street when suddenly a burgundy car with Mercado driving and appellant in the front seat "flew around the corner" of Guthrie onto W. 81st and came at them. Alescia and Colton quickly jumped back to the east side of W. 81st; Turner, who

---

merits."  Respondent filed objections to this order on January 28, 2011.  (ECF No. 26.) Respondent's objections were overruled on February 9, 2011.  (ECF No. 28.)

[2]  Prior to the hearing, the Court denied two motions filed by Torrez requesting that his state claims be deemed exhausted.  (ECF Nos. 36, 39, 66.)

was on crutches, was still on the sidewalk a little distance behind Alescia and
Colton.

The car slowed as the Folks members separated.  When it did so, Owens
approached it and began fighting with Mercado through the open driver's side
window.  The two were exchanging punches as Colton threw rocks at the
still-rolling car.

While this was occurring, appellant suddenly began "bouncing around in the car."
He "got up on [his] seat" as he "turned around" to the back seat and "started
looking for something."  When he turned back again, Alescia shouted to his
friends to get away.  Colton obeyed; however, Owens, who was continuing to
grapple with Mercado "didn't have no time."  Appellant "reached over [Mercado]
and shot Zone" at close range in the chest.  Then the car sped away.

Owens stood for a moment, apparently in shock, then screamed.  At that, Turner
dropped his crutches and went forward as fast as he was able to catch Owens as
the victim collapsed.  Turner supported Owens the short distance to Alescia, who
stood in a nearby driveway.  Then, at Colton's direction, Turner left to inform
other gang members of the incident by appropriating a bicycle and pedaling away
with one leg.

Shortly thereafter, police and EMS responded to the scene. Owens was
transported to the hospital, where he was pronounced dead at 6:42 p.m.  A
detective of the Cleveland Police Department's Scientific Investigation Unit
("SIU") took photographs of the crime scene.

Detective Reese, who arrived at the scene at approximately 7:45 p.m., interviewed
some witnesses and also discovered that Alescia and Colton had been taken to the
First District police station; therefore later that night Reese spoke to them.  Thus,
he obtained information about the suspects involved in the shooting and their car.

The following day, Mercado was arrested.  That same day, at two separate times,
police officers took photographs of the wall appellant and Mercado had been seen
spray-painting.  By the time the second set of photographs were taken, Folks
members had painted over their rivals' graffiti.

The autopsy of Owens revealed he had expired from internal bleeding after a
single gunshot wound to the left chest, despite medical efforts to save his life.
From the fouling and stippling surrounding the wound, the assistant coroner who
performed the autopsy determined a muzzle-to-target distance of between six
inches and two feet.

On October 1, 1990, Mercado and appellant were indicted together for aggravated

murder, R.C. 2903.01, with a firearm specification.  The record reflects Mercado was eventually convicted of voluntary manslaughter in connection with the shooting.  However, despite the creation of a composite drawing based on witness' descriptions and a capias for his arrest, police efforts to locate appellant were unavailing.  So too were efforts to locate Turner.

The capias on appellant was finally returned on April 26, 1994.  At his arraignment, appellant entered a plea of not guilty to the aggravated murder charge.

Appellant's trial commenced on July 11, 1994.  On that day, the prosecutor notified the trial court on the record that Colton had just informed him that there was a possibility Turner could be located.  The prosecutor thus informed both the court and the defense that if Turner was found he would be called as a witness. Defense counsel objected.

The prosecution then presented its case-in-chief, calling the following as its witnesses: 1) Dr. Challener, the assistant county coroner who performed the autopsy on Owens; 2) Det. Reese; 3) Bonnie Rudolph, the SIU detective who had taken the photographs of the crime scene after Owens was transported to the hospital; 4) Derrick Turner; and 5) Miguel Colton.  The state also introduced the following exhibits into evidence: 1) the autopsy protocol, 2) photographs taken of the victim at the assistant coroner's direction; 3) the photographs taken of the crime scene; 4) photographs of the spray-painted wall; and 5) a photograph of Mercado taken for identification purposes.

Appellant then made a Crim.R. 29 motion for acquittal.  The trial court granted the motion with respect to the charge of aggravated murder; the court ruled the state had failed to provide sufficient evidence on the element of prior calculation and design. Thus, trial proceeded on the lesser-included charge of murder, R.C. 2903.02, with a firearm specification.

Appellant testified in his own behalf.  His version of the details of the shooting differed from the version described by Turner and Colton.

Appellant admitted that in September 1990 he had been a member of a gang known as the "Rice and Beans," a junior part of a gang called the "Kings" who were rivals of the Folks.  He stated on the day of the shooting, he had been driving around with Mercado, who was already a "King," initially submitting job applications and, later, spray-painting walls.  Appellant testified that his gang did not engage in any violent activities and denied that the symbols he painted had either any meaning or portrayed any threats to other gangs.  According to appellant, however, the painting was a form of initiation to the Kings.

-4-

> Appellant testified that although the car was Mercado's, he and Mercado took turns driving it and also took turns spray-painting.  He further stated he was driving after painting the wall at Madison and W. 81st, he turned the corner at Guthrie and W. 81st about twenty minutes later, he was proceeding slowly, and the Folks suddenly stepped out from between cars and began throwing "bricks" at them.  Appellant testified he "ducked," heard a sound "behind his head," and realized Mercado had "popped a shot."  He stated he did not know Mercado had pulled out a gun until they had left the area.  Appellant also testified that after he found out about Owens' death, he went to live in another state because he was "afraid" of Mercado.

*State v. Torrez*, 1995 Ohio App. LEXIS 3479 at **1-8 (Ohio Ct. App., Aug. 24, 1995)(footnotes omitted).

Although factual determinations made by state courts are "presumed to be correct" in habeas corpus proceedings, Torrez challenges this factual history.  *See* 28 U.S.C. § 2254(e)(1); *House v. Bell,* 283 F.3d 37 (6th Cir. 2002).  Indeed, testimony at the evidentiary hearing conducted in 2011 conflicts with the above factual determinations made by the state appellate court.

## II.  Procedural History

### A.  Conviction

In September of 1990, the Cuyahoga County Grand Jury charged Torrez with one count of aggravated murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01 together with a firearm specification.  (ECF. No. 8, Exh. 1.)

On April 27, 1994, Torrez, after over three years on the lamb, pled "not guilty" and the matter proceeded to a jury trial.  (ECF No. 8, Exh. 2.)  At the close of the prosecution's case, Torrez moved for a judgment of acquittal pursuant to Ohio Criminal Rule 29.  (ECF No. 8, Exh. 3.)  Torrez's motion was granted as to the charge of aggravated murder, and the trial continued on the reduced charge of murder in violation of O.R.C. § 2903.02.  *Id.*  Torrez was convicted of

murder and the firearm specification.  (ECF No. 8, Exh. 4.)  On July 29, 1994, the trial court

sentenced Torrez to an indefinite term of fifteen years to life to be served consecutively with a

three year term for the specification.  (ECF No. 8, Exh. 5.)

**B.    Direct Appeal**

On August 12, 1994, Torrez, through counsel, filed a Notice of Appeal with the Court of

Appeals for the Eighth Appellate District ("state appellate court") raising the following

assignments of error (ECF No. 8, Exh. 6) :

> 1.    The trial court abused its discretion in permitting the testimony of
>       DERRICK TURNER (a.k.a. "BEAR"), whose name was not provided
>       counsel for Defendant/Appellant prior to trial.
>
> 2.    Permitting a composite sketch of the alleged assailant to be shown to
>       witnesses without a proper foundation was an abuse of discretion by the trial
>       court, highly prejudicial to the Defendant/Appellant, and reversible error.
>
> 3.    It was error for the trial court to permit the Plaintiff/Appellee to introduce
>       the Coroner's photograph (Exhibit 3) depicting surgery performed on the
>       victim.
>
> 4.    It was Prosecutorial misconduct and an abuse of discretion by the trial court
>       to permit questioning of Defendant/Appellant about his prior employment.
>
> 5.    The trial court erred in failing to direct a verdict of acquittal and by allowing
>       the verdict to stand which was not supported by the weight of the evidence.
>
> 6.    The conviction of Defendant/Appellant is against the manifest weight of the
>       evidence.
>
> 7.    The trial court erred in refusing to allow the admission of CARLOS
>       RODRIGUEZ, JR.'s statement when the witness was unavailable.

(ECF No. 8, Exh. 7.)[3]

------

[3]  On June 8, 1995, Torrez, *pro se*, filed a supplemental brief raising eleven additional
assignments of error.  (ECF No. 8, Exh. 9.)  Despite noting Torrez's failure to follow the
rules of appellate procedure, the state appellate court addressed Torrez's additional

On August 24, 1995, Torrez's conviction was affirmed.  (ECF No. 8, Exh. 10.)  The state appellate court found that Carlos Rodriguez's statement was hearsay that "fail[ed] to comport with any of the exceptions to the hearsay rule listed in Evid. R. 804(B)."[4]  *Id.*  Torrez did not a file a timely appeal with the Supreme Court of Ohio, but did request leave to file a delayed appeal on December 9, 1995.  (ECF No. 8, Exhs. 11-12.)  On December 13, 1995, Torrez's request was denied.  (ECF No. 8, Exh. 13.)

**C.   Postconviction Relief and Other State Court Filings**

On July 19, 2005, almost ten years after his direct appeal concluded, Torrez, *pro se*, filed a petition for post-conviction relief pursuant to O.R.C. § 2953.21(A)(1)(a) & (c).  (ECF No. 8, Exh. 14.)  In his petition, Torrez claimed that two pieces of evidence confirm that he was the driver of the vehicle on the day of the murder and ***not*** the shooter: (1) the statement of Rodriguez, an eyewitness, given the day of the incident that identified Mercado as the shooter; and, (2) a notarized transcription of a recorded conversation that occurred in March of 2001 between the affiant, Fidel Sanchez, and Colton, wherein the latter admitted that Mercado was the shooter.[5]  *Id.*  Torrez raised the following ground for relief:

> Petitioner was denied his Sixth Amendment right to effective assistance of trial counsels [sic] when trial counsel's failure to interview and investigate a eyewitness resulted in the deprivation of his Fourteenth Amendment right to Due Process.

*Id.*  On September 30, 2005, the trial court denied the motion stating that it "failed to set forth

---

assignments of error.  (ECF No. 8, Exh. 10.)

[4]  Rodriguez was "unavailable" at trial, as neither the prosecution nor the defense could locate him.

[5]  Colton was one of only two witnesses at trial that identified Torrez as the shooter.

substantive grounds for relief."  (ECF No. 8, Exh. 17.)

On July 22, 2008, Torrez, *pro se*, filed a Motion for Relief from Judgment pursuant to Ohio Civil Rule 60(B).  (ECF No. 8, Exh. 18.)  According to Respondent, the trial court has not ruled on this motion.  (ECF No. 8 at 10.)

On August 18, 2008, Torrez, *pro se*, filed a motion for a new trial.  (ECF No. 8, Exh. 21.) On November 6, 2008, Torrez's motion was denied.  (ECF No. 8, Exh. 24.)  On November 25, 2008, Torrez appealed the denial.  (ECF No. 8, Exh. 25.)  The appeal was dismissed on February 2, 2009 for failure to file the record.  (ECF No. 8, Exh. 26.)   On February 12, 2009, Torrez filed a motion for reconsideration which was denied.  (ECF No. 8, Exhs. 27 & 28.)

On April 23, 2009, Torrez, *pro se*, filed a second appeal challenging the trial court's denial of his motion for a new trial.  (ECF No. 8, Exhs. 29-30.)  On May 11, 2009, the appeal was dismissed *sua sponte*.  (ECF No. 8, Exh. 31.)  On July 16, 2009, Torrez, *pro se*, filed a Notice of Appeal and Motion for Delayed Appeal with the Supreme Court of Ohio.  (ECF No. 8, Exhs. 32-33.)  On August 26, 2009, Torrez's motion for leave to file a delayed appeal was denied.  (ECF No. 8, Exh. 34.)

**D.    Federal Habeas Petition**

On March 17, 2010, Torrez filed a Petition for Writ of Habeas Corpus asserting the following grounds for relief:

> GROUND ONE: Petitioner was denied his Constitutional rights to fundamental Due Process in violation of the Fourteenth (14th) Amendment to the United States Constitution.
>
> Supporting Facts: The State deliberately withheld alibi evidence that cleared Petitioner of the offense of Murder, when Petitioner is actually innocent.

-8-

GROUND TWO: Petitioner's Due Process was violated when the Trial Court denied his Motion For New Trial Based Upon Newly Discovered Evidence.

GROUND THREE: Petitioner was denied effective assistance of trial counsel in violation of 6th Amendment to the U.S. Constitution.

GROUND FOUR: The conviction of Petitioner is against the Manifest Weight of the Evidence.

(ECF No. 1.)

### III.  Summary of the Evidence

**A.  Evidence Elicited at Torrez's Trial in 1994**

At Torrez's trial in 1994, the following prosecution witnesses testified: assistant county coroner Robert Challener, M.D., police detectives Samuel Reese and Bonnie Rudolph, and eyewitnesses Deric "Bear" Turner and Miguel Colton.  Torrez testified as the sole witness for the defense.  Their testimony is summarized below.

Dr. Challener testified that he performed an autopsy on the victim, Brian "Zone" Owens, who had suffered a single gunshot wound to the left part of his chest.  (ECF No. 9, Tr. 22, 26, 34.)  There was stipling (*i.e.* burned or partially burned gunpowder) around the entrance wound, indicating that the victim was no more than two feet away from the weapon when he was shot. (*Id.*, Tr. 31-33.)

Detective Reese testified that he investigated the shooting.  (ECF No. 9, Tr. 48-50.)  A photograph marked as State's Exhibit No. 12 depicted a crutch near the vicinity of the crime. (*Id.*, Tr. 54-56.)  He and Detective Healy spoke to witnesses – Carlos Rodriguez, his mother Nora Rodriguez, and "other people who were there."  (*Id.*, Tr. 57.)  Detective Reese learned from

the Rodriguezes that two males – Alfonso Alicea[6] and Miguel Colton – had been transported to the police station.  (*Id.*, Tr. 57-58.)  That same day, September 11, 1990, Detective Reese interviewed Alicea and Colton.  *Id.*  Within the next few days, written statements were also obtained from them.[7]  (*Id.*, Tr. 62.)  On or about September 12, 1990, Joseph "Chaz" Mercado was arrested.  (*Id.*, Tr. 62-64.)  Torrez was not located until 1994.  (*Id.*, Tr. 64-65, 76.)  Detective Reese was unable to locate Alicea in the weeks leading up to Torrez's trial.  (*Id.*, Tr. 82.)  On cross-examination, Detective Reese indicated that eyewitnesses Colton and Alicea, together with the victim, were members of the same street gang, the Folks.  (*Id.*, Tr. 85.)

Detective Rudolph testified that she was with the Scientific Investigation Unit and processed the crime scene on September 11, 1990.  (ECF No. 9, Tr. 88-89.)  She photographed the area and searched for trace evidence such as fingerprints or bullet casings, but found nothing worth collecting.  (*Id.*, Tr. 91-92.)

Deric "Bear" Turner, during *voir dire*[8] outside the presence of the jury, stated that late in the evening on September 11, 1990, he was inside Bobby Mitchell's house with the victim Owens, Alicea, and Colton when a girl named Kathy told them that Pablo [Torrez] and Chaz [Mercado], whom he identified as rival gang members, were "tagging up the walls" in the

---

[6]  At trial and in state court documents, Alfonso Alicea is spelled "Alphonso Alescia." However, this Court will utilize the former spelling, as it is the one given by Mr. Alicea at the evidentiary hearing.  (ECF No. 84, Tr. 319.)

[7]  In *voir dire*, Detective Reese testified that Colton mentioned an eyewitness with the nickname "Bear," who was described as a large black male.  He never learned that Bear was Deric Turner.  (*Id.*, Tr. 119-20, 123.)

[8]  *Voir dire* was conducted because Turner was not on the State's witness list and the defense objected to a surprise witness.  (ECF No. 9, Tr. 93-99.)  According to Turner, Colton asked him to come to court to testify the previous night.  (*Id.*, Tr. 108.)

neighborhood (*i.e.* drawing graffiti on walls with spray paint).  (ECF No. 9, Tr. 100-01.)

Afterwards, he, Owens, Alicea, Colton, Mitchell, along with Kathy, went to investigate.  (*Id.*, Tr.

101.)  Being on crutches caused him to be about eighteen (18) feet behind Owens.  (*Id.*, Tr. 101-

02.)  A car driven by Mercado with Torrez in the passenger seat  "shot around the corner."  (*Id.*,

Tr. 102.)  Mercado and Owens began fighting.  *Id.*  Mercado tried getting out of the car, but

Owens prevented him from doing so.  *Id.*  Turner claimed to be standing on the sidewalk with his

crutches as the struggle transpired.  (*Id.*, Tr. 103.)  According to Turner, Alicea told Owens to

get away from the car.  *Id.*  Torrez began moving around frantically inside the car.  *Id.*  He

produced a gun and shot Owens.  *Id.*  The car separated Owens from his companions so that

Owens was on the driver side of the car while Turner, Colton, and Alicea were on the sidewalk

facing the passenger side of the car.  (*Id.*, Tr. 104.)  After Owens was shot, Turner dropped the

crutches and carried him to the sidewalk.  (*Id.*, Tr. 105.)  A "guy named Cope and his mother

came outside because it was their driveway."  *Id.*  At Alicea's suggestion, Turner got on a

bicycle to try to find "some of the fellows and tell them what happened."  *Id.*  He was not at the

scene when the police arrived.  (*Id.*, Tr. 106.)  He never talked to the police despite having the

opportunity to do so.  (*Id.*, Tr. 106-07.)

On direct examination, Turner testified that he and the victim had both been members of

the Folks gang.  (ECF No. 9, Tr. 132-33.)  He indicated that his nickname was "Bear," but he

was no longer affiliated with the gang.  (*Id.*, Tr. 134.)  He had convictions for attempted grand

theft auto and aggravated assault.  (*Id.*, Tr. 135.)  On the evening of September 11, 1990, he was

at Bobby Mitchell's house with Owens, Alicea, Colton, and Mitchell.  (*Id.*, Tr. 136.)  He stated

that a girl named Kathy came to the house and told them that members of a rival gang were

"tagging up" the neighborhood.  (*Id*., Tr. 137-38.)  Afterwards, Turner, Owens, Colton, and Alicea went to look at the building that had been tagged.  (*Id*., Tr. 139.)  At that time, Turner had a broken leg and needed crutches to walk.  (*Id*., Tr. 139-40.)  As Colton and Owens began crossing the street, a car flew around the corner of Guthrie street.  (*Id*., Tr. 141)  Turner was on the sidewalk at that time, but Owens, Colton, and Alicea were in the middle of the street.  (*Id*., Tr. 141-42.)  The car separated Owens from Colton and Alicea, so that the latter two were on the same side of the car as Turner, while Owens was on the far side of the car.  (*Id*., Tr. 142-43.)  The car contained two passengers in the front seats.  (*Id*., Tr. 143.)  The car was being driven by Chaz [Mercado] with whom Owens began to fight.  (*Id*., Tr. 144.)  The driver's side door opened not even a quarter of the way, when Owens pushed the door closed, continuing to hit Mercado.  *Id*.  The passenger, who Turner identified as Pablo [Torrez], began bouncing around in the car, retrieved a gun from the back seat, and shot Owens.  (*Id*., Tr. 144-45.)  Turner stated that he got a good look at Torrez firing the gun.  (*Id*., Tr. 145.)  Turner positively identified Torrez in the courtroom as the shooter.  (*Id*., Tr. 145-46.)  As the car pulled away, Turner embraced Owens and helped him walk to where Alicea was standing in Cubbie's driveway.  (*Id*., Tr. 146-47.)   He identified State's Exhibit No. 13 as depicting Cubbie's driveway and a crutch.  (*Id*., Tr. 147.)  Turner rode away on a bicycle to inform other members of the Folks gang.  (*Id*., Tr. 148.)  By the time he returned, only one police car and news media representatives were present at the scene.  (*Id*., Tr. 149.)

On cross-examination, Turner stated that he was no longer a gang member, but had been one for seven or eight years before the shooting.  (ECF No. 9, Tr. 163, 167.)  According to Turner, one night prior to Owens's death, Torrez and another rival gang member called Chaos

-12-

fired shots at Owens, Alicea, and Colton while he was waiting for a bus.  (*Id.*, Tr. 170.)  Turner knew who the shooters were because the others identified them for him and said "there go Chaos and Pablo."  (*Id.*, Tr. 171.)  Turner stated that he has never heard the name Carlos Rodriguez, but on re-cross examination indicated that he knew a person nicknamed Cubbie.  (*Id.*, Tr. 172, 214.) At the time of the shooting, Turner testified that Torrez did not have a full beard, was wearing a hat, had frosted or dyed some of his hair, had longer hair than at trial, and "had more meat on his bones."  (*Id.*, Tr. 174-75.)  He and the others did not throw rocks at the car and did not have any weapons with them during the encounter.  (*Id.*, Tr. 185-86.)  He did not see Torrez's face completely until after the car pulled away and Torrez looked back out of the window.  (*Id.*, Tr. 188, 195.)  At the time, he did not know what Torrez looked like, but Alicea and Colton did. (*Id.*, Tr. 199.)  He never identified Torrez as the shooter to the police.  (*Id.*, Tr. 201.)

Miguel Colton testified that he and the victim were members of the Folks gang.  (ECF No. 9, Tr. 223.)  On September 11, 1990, he was at the house of a fellow gang member, whom he only knew as "Dread," lifting weights with Bear [Turner], Owens, and Alicea.  (*Id.*, Tr. 224-26.)  A woman named Kathy told them that Pablo [Torrez] and Chaz [Mercado] were tagging walls just down the street.  (*Id.*, Tr. 226.)  Colton had heard their names before, but did not know what they looked like.[9]  (*Id.*, Tr. 226-27.)  Colton said that he, Alicea, Turner, and Owens decided to go down the street to "check it out."  (*Id.*, Tr. 227.)  They were walking down the middle of the street, and he saw Torrez and Mercado finish their tagging and disappear from view.  (*Id.*, Tr. 228.)  Afterwards, the two individuals shot around the corner of Guthrie in a

---

[9] Colton later testified that he had seen Torrez prior to the day Owens was shot.  (*Id.*, Tr. 247.)

burgundy Celebrity.  (*Id*., Tr. 229-30.)  Colton thought that the car was going to run them over.
(*Id*., Tr. 230-31.)  He said he was in the street with Owens and Alicea, while Turner, who was on
crutches, was "still coming."  (*Id*., Tr. 231.)  The car stopped between them in front of Carlos's
("Cubbie") house.  (*Id*., Tr. 232.)  Colton and Alicea went towards Torrez's side of the car while
Owens went towards the driver's side and Mercado.  (*Id*., Tr. 232-33.)  Colton observed
Mercado and Owens fighting through the open window of the car, while he threw a rock into the
passenger side of the car.  (*Id*., Tr. 233-34.)  Colton then observed Torrez turn around and start
looking for something in the back seat.  (*Id*., Tr. 234.)  Colton heard Alicea exclaim "look out, he
is looking for a gun."  *Id*.  Colton said Torrez placed the gun against Owens's chest and fired
once.  *Id*.  The car was then driven away.  (*Id*., Tr. 234-35.)  Colton saw Owens staggering;
Turner helped Owens towards Cubbie's driveway into Alicea's arms.  (*Id*., Tr. 235.)  Colton
identified Torrez as the person he saw looking at him through the passenger side window.  (*Id*.,
Tr. 236.)

        Thereafter, the police came and an ambulance transported Owens to the hospital.  (*Id*., Tr.
237.)  Colton and Alicea were taken to the police station where they made statements.  *Id*.
Colton identified Torrez and Mercado simply as "Pablo and Chaz," not knowing their last
names.  (*Id*., Tr. 238.)  Colton described Torrez as having frosted hair that was longer in the
back, standing 5'6" tall, and weighing approximately 140 pounds.  (*Id*., Tr. 239.)  He described
Torrez as being smaller at trial than at the time of the shooting.  *Id*.  After the incident, Colton
examined the graffiti left by Torrez and Mercado.  (*Id*., Tr. 240-43.)  According to Colton, the
graffiti contained gang symbols associated with the Kings, the names of Pablo and Chaz, and the
letters F and K, which he interpreted as meaning "Folks killers."  *Id*.

-14-

On cross-examination, Colton stated that he went to Turner's house to ask him to testify at trial.  (ECF No. 9., Tr. 253-55.)  He stated that Turner was at the scene of the shooting, but was approximately 25 feet behind.  (*Id*., Tr. 252-53.)  The driver was not trying to exit the vehicle.  (*Id*., Tr. 259.)  Colton threw two rocks at the car, one before the passenger retrieved the gun.  (*Id*., Tr. 260-62.)  Nobody else threw things at the car.  (*Id*., Tr. 263.)  Alicea had a broken leg and was wearing a brace.  (*Id*., Tr. 263-64.)  Colton identified "Cubbie" as Carlos Rodriguez.  (*Id*., Tr. 266.)  He said Rodriguez was not a gang member and described him as a "good boy."  *Id*.  Colton said that he could not dispute his written statement that said Rodriguez was present at the time of the shooting, but at trial he could not remember whether Rodriguez was there.  (*Id*., Tr. 266-67.)  When he heard Alicea say the passenger was looking for a gun, he turned and ran.  (*Id*., Tr. 277-78.)  Although Colton maintained that he had seen Torrez once before the incident, he agreed that his statement to police indicated that he had never seen him before.  (*Id*., Tr. 279-80.)

Pablo Torrez, the Petitioner herein, testified that he was a member of the Rice and Beans gang.  (ECF No. 9, Tr. 316.)  On September 11, 1990, Mercado picked him up around noon in a burgundy Chevrolet Celebrity.  (*Id*., Tr. 317-19.)  Torrez stated that he did not have frosted or dyed hair at that time.  (*Id*., Tr. 322-23.)  Mercado and Torrez picked up 8 to 10 cans of spray paint and proceeded to the area of Madion Avenue and West 81st Street.  (*Id*., Tr. 323, 329.)  Torrez stated that he was going to "tag up" some walls as part of his initiation into the Kings.  (*Id*., Tr. 321, 323-24.)  They stopped at more than twenty places to spray paint.  (*Id*., Tr. 348.)  He claimed that it was Mercado who chose the neighborhood and the wall where they spray painted graffiti.  (*Id*., Tr. 324-25.)  Torrez conceded that Exhibits 17 and 18 depicted graffiti that

-15-

he had drawn, but denied the letters F and K was a threat to the Folks gang.  (*Id.*, Tr. 324-25.)

Torrez testified that the F and K stood for "fool Kings."[10]  (*Id.*, Tr. 325.)  Afterwards, Mercado

began tagging a school wall while Torrez waited in the car in the driver's seat.  (*Id.*, Tr. 327.)

Torrez stated that when one of them was painting the other one would always be in the driver's

seat.  (Id., Tr. 348-49.)  When they left the school, Torrez indicated that he was driving.  (*Id.*, Tr.

329.)  He stated that when he rounded the corner on Guthrie, a number of people popped out

from behind parked cars and started throwing bricks at the car.  (*Id.*, Tr. 330-31.)  He did not

know any of the people who were throwing bricks at the car, but Mercado told him that they

were members of the Folks gang.  (*Id.*, Tr. 343-44.)  He accelerated the car when bricks began

hitting the vehicle, but he denied trying to hit anyone.  (*Id.*, Tr. 332-33.)  While accelerating,

Torrez stated that he looked into the rear-view mirror and saw Mercado lean into the back seat

with his left hand and pulled out a gun.[11]  (*Id.*, Tr. 333-34.)  Afterwards, as Torrez accelerated,

Mercado "popped a shot" which he only heard but did not see.  (*Id.*, Tr. 334-35.)  Immediately

after the shot, Torrez saw the gun pointing towards the back window on the driver's side of the

car.  (*Id.*, Tr. 336-37.)  When Torrez asked Mercado what he did, Mercado responded that he

grabbed a gun from under the speaker box and "shot him."  (*Id.*, Tr. 338.)  Torrez, however, did

not see anyone get hit.  *Id.*  Torrez testified that there was no fighting or punching going on

between Mercado and anyone outside of the car.  The two exchanged places a little further up the

street and Mercado took over driving.  (*Id.*, Tr. 338.)  They "went back" to Mark Greene's house

---

[10]  On cross-examination, Torrez stated that the letters F and K stood for "being a full
King."  (ECF No. 9, Tr. 364.)

[11]  Torrez also testified that Mercado is left handed.  (*Id.*, Tr. 351.)

where Mercado returned the gun used in the shooting to Green, as it belonged to him.  (*Id.*, Tr. 338-39.)  Thereafter, the pair drove to Mercado's house.  (*Id.*, Tr. 339.)  Torrez stated that Mercado would not let him go home.  *Id.*  Mercado called some friends who helped strip the column of the car to make it appear as if it had been stolen.  (*Id.*, Tr. 339-40.)  Torrez claims he did not participate in that activity.  *Id.*  Torrez fled to New Jersey two days later because he was afraid of Mercado and his family.  (*Id.*, Tr. 341-42.)  Torrez stated that he did not fire the gun that killed Owens and had no advance knowledge that Mercado was going to do so.  (*Id.*, Tr. 346.)  Although Torrez was not told there was a gun in the car, he did know Mercado sometimes carried a weapon.  *Id.*  Before the shooting, while Torrez and Mercado were at Mark Greene's house, Torrez heard Greene and Mercado talking about a gun.  (*Id.*, Tr. 347-48.)  Torrez told Mercado that he was getting back in the car if there was a weapon on him.  (*Id.*, Tr. 348.)  Torrez also stated that he did not see a gun in the car on the day in question.  *Id.*  Torrez further testified that he did not know of anyone named Carlos Rodriguez or Cubbie.  (*Id.*, Tr. 350.)

On cross-examination, Torrez testified to the following.  He was initially a member of a group or gang called the Latin Rascals.  (ECF No. 9, Tr. 354-55.)  The name was later switched to the Rice and Beans.  (*Id.*, Tr. 355-58.)  There were six members, including Jose Nieves, Joseph Mercado, Louis Torrez, Richard Santiago, and a person known as Chaos.  *Id.*  The Kings gang was composed of the older people who had "climbed the ladder" from the Rice and Beans.  (*Id.*, Tr. 358.)  At the time of the shooting, there were three members of the Kings: Edgar Hernandez, Miguel Torrez, and Joseph Mercado.  (*Id.*, Tr. 360.)  He was driving approximately fifteen miles per hour when Mercado fired the gun. (*Id.*, Tr. 389, 392.)  He did not see where

Owens was standing when the shot was fired.[12]  (*Id.*, Tr. 389-90.)  Upon returning to Mark

Greene's house, Torrez got into an argument with both Mercado and Greene over the shooting.

(*Id.*, Tr. 394-95.)  Torrez thought that Mercado went inside Mark Greene's house to report the

car stolen.  (*Id.*, Tr. 396.)  Torrez left his mother's house after she told him that police detectives

had been there.  (*Id.*, Tr. 397.)  When asked why he did not help the police in their investigation

of Mercado, Torrez responded that he "wasn't going to be called a snitch."  (*Id.*, Tr. 398.)

**B.  Evidence Elicited at the Evidentiary Hearing**

At the evidentiary hearing held on July 21 and 22, 2011, the following individuals testified:

Joseph Mercado, Fidel Sanchez, Alfonso Alicea, Deric Turner, Carlos Rodriguez, Mark Greene,

Nestor Martinez, Rita Morales, Carlos Rodriguez, Arturo Ramos, Jr., Elena Ramos, Edgar

Hernandez, Jaci Torres, assistant county prosecutor Richard Bombik, and investigator Michael

O'Malley.  The relevant testimony is summarized below.

<u>Joseph Mercado</u> testified that he was not in court voluntarily, but only because a subpoena

was issued by Torrez's counsel.  (ECF No. 83, Tr. 129.)  He was Torrez's co-defendant in the

homicide of Owens.  (*Id.*, Tr. 132.)  In connection with that case, he accepted a plea agreement

resulting in a voluntary manslaughter conviction with a gun specification.  *Id.*  When asked why

he did so, Mercado indicated that he was, in fact, guilty.  *Id.*  He received a sentence of eight to

twenty-five years, of which he served nine.  (*Id.*, Tr. 132-33.)  At the time of the shooting, he

---

[12] On re-cross examination, Torrez testified that the whole incident lasted thirty to forty seconds and that the car was constantly in motion.  (ECF No. 9, Tr. 414-15.)  This portion of the testimony is questionable, as a car traveling 15 mph would have traveled a distance of 220 yards in thirty seconds.  This would be difficult to reconcile with the coroner's testimony as to the distance of the muzzle to the victim being no more than two feet.

was known by the nickname "Chaz."  (*Id*., Tr. 134.)  Nobody from the police department or the prosecutor's office asked him for his statement after he pled guilty.  (*Id*., Tr. 133.)  He knew Torrez through their mutual membership in the Rice and Beans gang.  (*Id*., Tr. 135.)  He was in the car, as the passenger, with Torrez driving when Owens was shot.  (*Id*., Tr. 135-36.)  In fact, Mercado expressly testified that he was the one who shot Owens.  (*Id*., Tr. 136.)  Mercado stated that he was tagging a building when somebody began yelling at him, so he jumped in the car and Torrez drove away.  (*Id*., Tr. 137.)  When they reached the end of the street, Mercado heard Torrez yell "Folks."  *Id*.  Mercado heard the car being hit by bricks, and it was being punched and kicked.  *Id*.  Mercado retrieved a small caliber gun from the back seat with the intent to scare the person who was near the car.  (*Id*., Tr. 137-38.)  However, instead the person was shot.  (*Id*., Tr. 138.)  Mercado stated that when they drove down the street, it was not his intent to kill anyone.  *Id*.  Afterwards, Mercado reported the car stolen and dumped it on Train Avenue with the intent to conceal what he did.  *Id*.  He also filed a police report.  *Id*.  He indicated that he had nothing to gain from testifying, and, after speaking with his attorney, neither did he believe he had anything to lose.  (*Id*., Tr. 138-39.)  Mercado stated that Torrez did not know there was going to be a shooting that day, as Mercado did not anticipate doing it.  (*Id*., Tr. 139.)  He turned himself in to the police on September 12, 1990, after his mother encouraged him to do so.  (*Id*., Tr. 139, 141.)

On cross-examination, Mercado said he did not "take the fall" for the shooting, but was, in fact, guilty.  (ECF No. 83, Tr. 140.)  He did not tell anyone that he was the shooter.  (*Id*., Tr. 142.)  He did not feel that Torrez took the fall for him, because, the way the prosecution explained it to him, Torrez was just as guilty even if he was not the actual shooter.  (*Id*., Tr. 142-

43.)  Mercado stated that he was not present in court to do "a right thing or a wrong thing," but that he was there because of a subpoena.  (*Id*., Tr. 143.)  On the day in question, he and Torrez spray painted graffiti in the West Tech area.  (*Id*., Tr. 144.)  He does not recall if he went to Mark Greene's house that day, but indicated that he used to "hang out with Mark Greene a lot." *Id*.  He did not recall if they tagged twenty places, but indicated that they did vandalize a lot of properties.  (*Id*., Tr. 145.)  Mercado also could not recall whether he gave the gun back to Mark Greene after the shooting, but specifically denied giving the gun to his mother.  (*Id*., Tr. 145-46.)  After the shooting, Mercado testified that he and Torrez split up.  (*Id*., Tr. 146.)  He denied making any threats toward Torrez.  *Id*.  When asked why it took so long for him to come forward, Mercado indicated that "[i]f you never subpoenaed me, you would never have seen me."  (*Id*., Tr. 147.)  He does not remember if he ever told Torrez that he had a gun that day or whether he procured the gun from Mark Greene.  (*Id*., Tr. 147-48.)  He indicated that it was his assumption that he could not return to prison for Owens's death.  (*Id*., Tr. 148.)

Fidel Sanchez, whose prior criminal record was admitted as Petitioner's Exhibit B, testified that he knew Torrez from their joint stint at the Madison Correctional Institution sometime between 1994 and 2000.  (ECF No. 83, Tr. 11, 14.)  Torrez would break down and cry on a weekly basis claiming that he was in prison for something he did not do.  (*Id*., Tr. 15.)  While at Richland Correctional Institute, Sanchez overheard another inmate named Colton, whom he only knew by his surname, talking about Torrez's case.  (*Id*., Tr. 15-16.)  After Sanchez was transferred to Lake Erie Correctional Institute ("LECI"), he again met Colton in 2002 or 2003

-20-

and tape recorded a conversation regarding Torrez's case.[13]  (*Id*., Tr. 17.)  Sanchez stated that he approached Colton and asked him if he wanted to play dominoes.  (*Id*., Tr. 19.)  When Colton responded in the affirmative, Sanchez retrieved the dominoes and the cassette player/recorder from his dormitory.  (*Id*., Tr. 19.)  Sanchez testified that Petitioner's Exhibit A contains the recording that he made of his conversation with Colton.  (*Id*., Tr. 21.)

        MUSIC STOPPED –

        Mr. Colton -    What's up with the music?

        Mr. Sanchez -  I'm rewinding it right now, dog.

        Mr. Colton -    What about Richland you said?

        Mr. Sanchez -  Remember you was telling to me about that dude Chaz and Pablo in Richland?

        Mr. Colton -    Yeah, yeah.

        Mr. Sanchez -  Well yesterday I called my cousin, man, and he was home with some dude Chaz that got out of jail a few years ago, man.

        Mr. Colton -    Yeah, that's the same Chaz who shot my dude Zone.  You know that car I was talking about, that red Chevy? Pablo was driving that day.

        Mr. Sanchez -  Well, I don't want my people around that dude.

        Mr. Colton -    Yeah, I don't blame you dog.

        Mr. Sanchez -  I thought, I thought you had to go to court, man?

        Mr. Colton -    I did, I did, but that's where, that's where everything got all twisted up.

---

[13] Sanchez testified that at LECI he was able to buy a radio with a double cassette player that was capable of recording.  (ECF No. 83, Tr. 17.)

Mr. Sanchez -  Oh yeah?

Mr. Colton -  Yeah, because me and Bear, who came with me, knew
Pablo was the driver, he knew he was the driver and shit.
The Prosecutor said, that um, that he wasn't going to help
that much.  So you know, so we just left it the way it was.[14]

Mr. Sanchez -  Man, that's crazy how that turned out man.

Mr. Colton -  What's more crazy is that I had to tell Bear everything
because he didn't see shit.

Mr. Sanchez -  Damn!

Mr. Colton -  That's crazy huh?

Mr. Sanchez -  Yeah, its on you now man, ---- MUSIC CONT.

(Petitioner's Exh. A.)  Though Sanchez appeared somewhat confused on this point, he testified

that he had sent the recording to his sister and told Torrez about it.  (ECF No. 83, Tr. 22-23.)

Sanchez testified that he made the recording on his own, and not at anyone's behest.  (*Id.*, Tr.

28.)

On cross-examination, Sanchez stated that the affidavit he signed indicated that the

recorded conversation took place in March of 2001, and that his recollection was better back

then than it is now.  (ECF No. 83, Tr. 35-36.)  Sanchez did not recall how much later he told

Torrez about the conversation.  (*Id.*, Tr. 37.)  Nor could he recall why he waited until 2005 to

---

[14] At the evidentiary hearing, assistant prosecuting attorney Richard Bombik testified
that he prosecuted the case against Torrez, he remembered a witness named Colton, but
does not recall having any such conversation.  (ECF No. 83, Tr. 46, 49-50.)  In addition,
Mr. Bombik stated that his basic instruction to witnesses was always to "just tell the
truth."  *Id.*

-22-

prepare the affidavit.[15]  (*Id*., Tr. 43.)

    Nestor Martinez, Petitioner Torrez's brother, also testified at the evidentiary hearing.  (ECF No. 83, Tr. 100.)  Although he knew Fidel Sanchez from prison, he learned about the aforementioned tape recording from his brother – not from Sanchez.  (*Id*., Tr. 101-102.)  When Martinez was released from prison in 2003, Torrez asked him to retrieve the tape recording from the Sanchez family.  (*Id*., Tr. 102.)  In late 2003, Martinez stated that he went to see the Sanchez family, but he could not find anyone with knowledge of the tape.  (*Id*., Tr. 103.)  Later, he was informed that the tape had been destroyed.  (*Id*., Tr. 103-04.)  Sometime in 2005, a woman named Bagi, who he believed to be Sanchez's sister, brought him a tape recording.  (*Id*., Tr. 104-06.)  After listening to the tape, he recognized the voices of Colton and Sanchez.  (*Id*., Tr. 105.)  He told Torrez that he had the tape in his possession both by letter and telephone.  (*Id*., Tr. 105-07.)  He played the tape for Torrez and sent him a transcript.  *Id*.  He held onto the tape until he was again incarcerated, at which time he gave the tape to his fiancé, Melissa.  (*Id*., Tr. 107-08.)  Martinez instructed his fiancé to provide the tape to Jaci Torres.  (*Id*., Tr. 108.)

    On cross-examination, Martinez stated that he never had any conversations about the tape with Fidel Sanchez.  (ECF No. 83, Tr. 110.)  He stated that he had the tape, which he did not copy, in his possession for five years before turning it over to his fiancé in 2010.  She, in turn,

---

[15]  The Respondent sent an investigator – Michael O'Malley – to interview Sanchez in prison regarding the circumstances under which the recording was made.  Mr. O'Malley testified and the tape recording of the interview was played in court.  (ECF No. 83, Tr. 223-35.)  In this Court's view, the recording and Mr. O'Malley's interview of Sanchez does not provide any information that would have a material impact on this report and recommendation.  It was clear from Sanchez's testimony that he had some memory issues – particularly with respect to dates.  As such, the Court finds it unnecessary to discuss O'Malley's testimony.

gave it to Jaci Torres after a few months.  (*Id*., Tr. 110-13.)  He never provided the police or any court with a copy of the tape.  *Id*.

Jacinta "Jaci" Torres testified that she knew Torrez's mother for over ten years through her work as a patient advocate.  (ECF No. 83, Tr. 236-37.)  After learning that Torrez was incarcerated, Ms. Torres began writing Torrez.  (*Id*., Tr. 238.)  They became pen pals.  *Id*.  At one point within the past year, Torrez asked Ms. Torres to retrieve an envelope from Nestor Martinez's house.  *Id*.  She picked up the envelope and provided it to Torrez's counsel.  (*Id*., Tr. 239.)  She never examined the contents.  *Id*.

Carlos Rodriguez, the only eyewitness not affiliated with either gang, testified as follows.  On September 11, 1990, he witnessed the shooting and gave a statement to police.  (ECF No. 83, Tr. 175.)  He identified his statement given to police, Petitioner's Exhibit FF, wherein he stated that (1) Mercado shot Owens, and (2) Alfonso Alicea and Miguel Colton were also present at the time of the shooting.[16]  (*Id*., Tr. 178-79.)  He identified Mercado as the shooter after being shown

---

[16]  The statement reads as follows:

It was Tuesday, September 11, 1990, I'd say it was about 5:30PM.  My mother told me to take the garbage out, and when I took it outside and when I was on my way back inside I saw MIGUEL [Colton], ALFONSO [Alicea] and ZONE, known as BRIAN OWENS.  Then me and MIGUEL started talking about the incident that happened the night before, then once we got by 2020 West 81ST , ZONE got off his bike and I was holding it by the handle bars.  After that, that's when ALFONSO heard the car radio.  And then he said here they come and I didn't know what was going on.  Once they hit the corner the passenger pointed at us and they like flew right at us trying to hit us with the car.  As they went by little Miguel grabbed a rock and threw it at em.  After that me and ALFONSO ran on the North side of the house, 2020 West 81ST, ZONE like went across the street and little MIGUEL he like stay on the grass on the lawn easing up towards the car.  When that was happening that when CHAZ was reaching behind the front seat towards the back.  He came up with a gun, I saw his hand like this, he was bringing it like back over the seat real slow.  Me and ALFONSO said it at the same time that he's got a gun.  After that he, Alfonso yelled ZONE, right when he yelled Zone the

-24-

a photograph.  (*Id*., Tr. 176, 179.)  Furthermore, at that point in time, he had known Mercado and

his family for at least three years.  (*Id*., Tr. 179, 182.)  Conversely, he had only known Torrez for

a short time, and only as Pablo.  (*Id*., Tr. 180.)  He received threats after he spoke to the police.

(*Id*., Tr. 177.)  He was not living in Cleveland at the time of Torrez's trial in 1994.  (*Id*., Tr. 177-

---

passenger CHAZ shot the gun.  And then ZONE stumbled like he was going to come
back across the street up where we were but went over and fell in my driveway,
2034West 81ST.  ALFONSO had already started running, because he was about to fall
and didn't want ZONE to hit his head on the concrete and he got there in time.  Like
after that I was behind ALFONSO and when I saw that he was shot I went inside the
house and caoled [sic] 9-1-1.  MIGUEL was about to chase the car but it went straight
towards LORAIN AVENUE.

Q.  How long have you known CHAZ?
A.  The first time I ever met him was when I was 13.
Q.  Do you know CHAZ' full name?
A.  NO, all I know is his last name is MERCADO.
Q.  Showing you this color [P]olaroid snapshot with the numbers 1712 printed on the
    back, what can you tell us about it?
A.  I'm almost positive that's CHAZ who was in the passenger seat who shot ZONE,
    BRIAN OWENS.  You told me his full name is JOSEPH CLEMENTE
    MERCADO.
Q.  Are you, or have you ever been a member of the FOLKS or the RICE AND
    BEANS?
A.  No.
Q.  Do you know the full name of ALFONSO and MIGUEL?
A.  ALFONSO is ALFONSO ALICEA, and I didn't know MIGUEL's last name.
Q.  Which side of the car was the shot fired from?
A.  The driver's side, the front of the back windows were down on that side.
Q.  When this incident had occurred had you been using any drugs, medication or
    alcohol?
A.  No.
Q.  Can you describe the gun that was used to shoot BRIAN OWENS?
A.  It looked like a .22 AUTOMATIC.
Q.  How long have you known Pablo?
A.  Since JANUARY this year.
Q.  Do you know PABLO'S full name?
A.  No.

(Petitioner's Exhibit FF.)

-25-

78.)

On cross-examination, Rodriguez stated that he had friends who were members of the Folks gang, including Alicea, Colton, and Owens. (ECF No. 83, Tr. 182.) He had initially trusted Alicea – and Colton for a short time – but found them to be "deceiving." (*Id*., Tr. 183.) He had taken the trash out and began talking to Owens, Colton, and Alicea when he heard a loud "[car stereo] system" thumping. (*Id*., Tr. 183-84.) The others said "[h]ere they come." *Id*. After the incident, he was threatened by Mercado's brother. (*Id*., Tr. 186.) He was apprehensive about testifying at the evidentiary hearing due to one of Torrez's cousins speaking to him about the case in March of 2011. (*Id*., Tr. 187.)

Deric "Bear" Turner testified at the evidentiary hearing by video conference from North Carolina. Immediately prior to the shooting of Owens, Turner was lifting weights at Bobby "Dredd" Mitchell's house. (ECF No. 84, Tr. 264.) Also present were Owens, Alicea, and Colton. *Id*. They were told that someone was tagging in their neighborhood. (*Id*., Tr. 265.) He, along with Owens, Colton, and Alicea, went to investigate, but saw nothing. *Id*. A couple of minutes later, a car came flying around the corner. *Id*. The car was occupied by Torrez and Mercado. *Id*. He was standing on the sidewalk when the car stopped. (*Id*., Tr. 269.) Turner stated that he was familiar with both Torrez and Mercado. *Id*. He had known Mercado for about four to five years, and Torrez for about a year or two. (*Id*., Tr. 265-66.) Turner stated that Owens began fighting with Mercado, and Torrez reached over Mercado and shot Owens. (*Id*., Tr. 266.) Torrez and Mercado drove away. *Id*. Turner helped carry Owens to the curb and laid him down in Alicea's arms. *Id*. Turner rode his bike to go get help and when he returned, nobody was at the scene. *Id*. He had not witnessed any prior confrontations between Owens and

-26-

Mercado.  (*Id.*, Tr. 267.)  Turner denied being coached by Colton to testify a certain way at Torrez's trial.  (*Id.*, Tr. 268.)

On cross-examination, Turner testified that he was 21 years old at the time of the shooting and had already been a member of the Folks gang for seven or eight years.  (ECF No. 84, Tr. 270.)  He had been a loyal gang member, and felt some loyalty to other gang members at the time of his testimony in 1994.  *Id.*  Turner indicated that he was not subpoenaed to appear at Torrez's trial, but testified after Colton asked him to do so.  (*Id.*, Tr. 271.)  He denied that Colton coached him.  *Id.*  He stated that he was separated from the other witnesses when they arrived at the courthouse.  *Id.*  Turner testified that he does not believe Colton any more because he "flipped from Folk to King" some time after Torrez's trial.  (*Id.*, Tr. 274-75.)  Turner stated that there was nobody on the street when they left the house, and that if Colton testified otherwise, he was mistaken.  (*Id.*, Tr. 276.)  At the time of the shooting he was on crutches and had a cast on his foot.  (*Id.*, Tr. 277.)  Turner denied that he was too far away from the shooting to see anything.  *Id.*  He knew Carlos "Cubby" Rodriguez and believes that Rodriguez was there at the time of the shooting.  (*Id.*, Tr. 281.)  After Torrez's counsel pointed out that Turner, at trial, testified that Rodriguez was not at the shooting, Turner testified that he could have been mistaken, as his focus was not on who was around, but on Mercado and Torrez – the Kings.  (*Id.*, Tr. 281-82.)  Turner also testified that he did not see Colton throw any rocks at the car.  (*Id.*, Tr. 288.)  He testified that he was not on the same side of the car as Colton, but on the driver's side of the car with Owens.  (*Id.*, Tr. 289.)  Turner stated that he could see the occupants of the car through car windows while Owens was hitting Mercado.  (*Id.*, Tr. 290.)  He stated that he recognized Torrez's face, but that he could not give a name until Colton or Alicea told him.  (*Id.*,

Tr. 295.)

Alfonso Alicea testified at the evidentiary hearing as follows.  The day Owens was shot and killed, he was working out at Bobby's house with Bear [Turner], Baby Face [Colton], and a couple of other guys.  (ECF No. 84, Tr. 319-20.)  He was a member of the Folks gang.  (*Id.*, Tr. 324.)  They left the house because a couple of the girls from the neighborhood told them that someone was "tagging on our corner."  (*Id.*, Tr. 320.)  They walked towards the two men, who, in turn drove towards them.  *Id.*  When the car stopped, Owens began yelling at the driver and a fight ensued.  (*Id.*, Tr. 321.)  Owens reached into the car punching the driver, who tried to fight him off.  *Id.*  The passenger began panicking, reached down between the seats, and came up with a pistol.  (*Id.*, Tr. 321.)  Alicea stated that the passenger looked at him, smiled, and then reached over the driver's side and shot Owens.  *Id.*  Alicea identified Torrez as the passenger and shooter.  *Id.*  Alicea testified that the passenger was skinny and little while the driver was bigger.  (*Id.*, Tr. 321-22.)  He testified that Torrez looked back at him, laughed, and the car drove away slowly.  (*Id.*, Tr. 322.)  Alicea testified that Owens walked towards him and collapsed in his arms.  *Id.*  He was familiar with both Mercado and Torrez prior to the shooting.  (*Id.*, Tr. 324.)  He spoke to police officers who arrived at the scene of the crime.  (*Id.*, Tr. 322.)  Alicea identified Respondent's Exhibits 9a and 9b as statements bearing his signature.  (*Id.*, Tr. 323-24.)  He did not receive a subpoena for Torrez's trial in 1994.  (*Id.*, Tr. 328.)

On cross-examination, Alicea testified that neither Colton nor Turner were with him walking down the street.  (ECF No. 84, Tr. 329-30.)  Moreover, neither Colton nor Turner were there when the car came down the street.  (*Id.*, Tr. 330.)  Alicea stated that Turner was "probably walking down the street" when Owens began hitting the driver.  (*Id.*, Tr. 330.)  At the time

-28-

Owens was shot, Alicea was standing on the passenger side of the car, but "people were coming from everywhere." (*Id*., Tr. 331-32.) When asked if Turner would be lying if he claimed to be the one that caught Owens after he was shot, Alicea responded "yes." (*Id*., Tr. 335-36.) Though the statement Alicea gave to police indicated that Chaz [Mercado] and another person called Kaos fired shots at him and Owens a few months earlier, Alicea had no recollection of the incident. (*Id*., Tr. 338-39.) He testified, however, that he would have been truthful when making the statement. *Id*.

Mark Greene testified that prior to being incarcerated in 1991, he lived at 2148 West 21st Street. (ECF No. 83, Tr. 158.) He was familiar with Mercado, but barely knew Torrez. (*Id*., Tr. 158-59.) He saw both Mercado and Torrez on the day Owens was shot. (*Id*., Tr. 160.) Greene stated that on that day Mercado drove to his house with Torrez, and Mercado asked him for a weapon. *Id*. Torrez, however, was not in the house when Greene gave Mercado the gun. (*Id*., Tr. 160, 165.) Mercado returned the weapon later that day. (*Id*., Tr. 160.) Greene stated that Mercado was "shooken up; frightened" when he returned and indicated that somebody was shot. (*Id*., Tr. 161.) Greene stated that he could not remember what Mercado said verbatim, but the way he understood it was that Mercado was the shooter. *Id*. Torrez was also shaken up, but not as badly as Mercado. *Id*. Greene took the gun back from Mercado, and held onto it for a day or two until members of Mercado's family asked for it. (*Id*., Tr. 161-62.) He gave them the gun. (*Id*., Tr. 162.) He was also planning on providing a false alibi for Mercado out of loyalty and friendship.[17] *Id*. Greene also testified that Mercado had telephoned the police to report that his

_____

[17] Petitioner's Exhibit CC is a copy of Mercado's Notice of Alibi, filed by his defense counsel with the Cuyahoga County Court of Common Pleas in 1991, which states that Mercado was at 2148 West 21st Street and 2708 Barber Avenue when Owens was shot.

car was stolen, despite the fact that the car was parked outside.  (*Id*., Tr. 163.)

On cross-examination, Greene testified that he could not remember whether he gave Torrez eight to ten cans of spray paint that day, but conceded it was possible.  (ECF No. 83, Tr. 165-66.) He did not recall whether Torrez argued with Mercado and him after the shooting.  (*Id*., Tr. 167.) He did recall Mercado wanting him to report the car as stolen.  *Id*.

<u>Rita Morales</u>, Torrez's mother, testified with the help of an interpreter.  Some time after the shooting of Owens, she heard Mercado say "I killed him."  (ECF No. 83, Tr. 153.)  She did not report this information to the police.  *Id*.  After the shooting, rocks were thrown at her house, but she did not know by whom.  *Id*.  She attempted to speak with Carlos Rodriguez after the shooting, but Rodriguez's mother would not allow it.  (*Id*., Tr. 154.)

<u>Arturo Ramos, Jr.</u> testified that he was no more than twelve years old at the time of the shooting.  (ECF No. 83, Tr. 190-91.)  He had known Torrez and Mercado for a long time.  *Id*. He described Torrez as a brother to him.  *Id*.  He remembers Mercado jumping around in his driveway claiming that he shot him (Owens).  (*Id*., Tr. 192-93.)  After that, Ramos said his mother grabbed him and took him inside.  *Id*.

<u>Elena Ramos</u>, mother of Arturo Ramos, testified that she has known Torrez all his life. (ECF No. 83, Tr. 197.)  Her children and Torrez played together.  *Id*.  She also knew the Mercado family.  *Id*.  Around the time of the shooting, she heard Mercado saying "I shot him.  I think I killed him."  (*Id*., Tr. 197-98.)  She grabbed her son Arturo, took him inside the house, and locked all the doors.  *Id*.  She never told anyone what Mercado said.  (*Id*., Tr. 198.)  She had a special relationship with Mercado, who would confide in her.  (*Id*., Tr. 201.)

On cross-examination, Ramos stated that she loved Torrez like a son.  (ECF No. 83, Tr.

199.)  She never spoke to police because she was afraid and did not know what to do.  (*Id.*, Tr. 199-200.)  Nobody asked her to come forward in 1994 when Torrez was being tried.  (*Id.*, Tr. 200.)

　　Edgar Hernandez, brother of Arturo Ramos and son of Elena Ramos, testified that he grew up with Torrez and that they were very close.  (ECF No. 83, Tr. 204.)  They were both members of the Rice and Beans, though he did not consider it a gang as there were only five to ten members.  (*Id.*, Tr. 205.)  He knew Mercado, but was closer to Torrez.  *Id.*  He went to Torrez's house after learning of the shooting, where he encountered both Torrez and Mercado.  (*Id.*, Tr. 207.)  Hernandez heard Mercado say "I shot him.  I think he's dead."  (*Id.*, Tr. 208.)  Afterwards, he heard Mercado say he had to strip the column of the car and report it stolen.  *Id.*  He and Torrez followed Mercado, who drove his car, on their bikes to Train Avenue.  (*Id.*, Tr. 209.)  Mercado began peeling the column of his car while he and Torrez stayed and watched for the police.  (*Id.*, Tr. 209-10.)  He never told the police what he heard Mercado say because he felt intimidated by law enforcement.  (*Id.*, Tr. 212-13.)  Hernandez stated that after Torrez's trial, at which he believed Mercado testified against Torrez, he told friends that Mercado was the shooter.  (*Id.*, Tr. 213-14.)  Thereafter, Hernandez testified that Mercado's brother, Benny, along with some others, kidnapped him at gunpoint and told him to keep his mouth shut.  (*Id.*, Tr. 214-16.)

### IV.  Statute of Limitations

　　This case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.  *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997).  The relevant provisions of AEDPA state:

-31-

(d)(1) A one year period of limitations shall apply to the filing of an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from the latest of–

    (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

    (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

    (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

    (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d)(1) & (2).

**A.    One-Year Limitation**

In the instant action, Respondent contends the Petition is time-barred as Torrez's conviction became final under 28 U.S.C. § 2244(d)(1)(A) on October 8, 1995, after the 45 day period in which he could have filed an appeal with the Ohio Supreme Court expired.[18]  (ECF No. 8 at 15.)

Respondent's calculation is correct.  However, a petitioner whose conviction became final prior to the effective date of the AEDPA, such as Torrez, had one year from the AEDPA's

_____

[18]  Pursuant to Ohio Supreme Court Practice Rule II § 2(A)(1)(a), an appeal must be filed within forty-five (45) days from the entry of the judgment being appealed.

-32-

effective date, until April 24, 1997, to file a petition for writ of habeas corpus. *See, e.g., Payton v. Brigano*, 256 F.3d 405, 408 (6th Cir. 2001)

The AEDPA tolls the one-year limitations period during the time "'a properly filed application for State postconviction or other collateral review . . . is pending.'" *Evans v. Chavis*, 546 U.S. 189, 191 (2006) (*quoting* § 2244(d)(2)); *Carey v. Saffold*, 536 U.S. 214 (2002); *accord Matthews v. Abramajtys*, 319 F.3d 780, 787 (6th Cir. 2003). Torrez took no action in state court for nearly a decade, as his first state filing after the conclusion of his direct appeal was a petition for post-conviction relief filed on July 19, 2005. (Doc. No. 8, Exh. 14.) It is well settled that "[o]nce the limitations period is expired, collateral petitions can no longer serve to avoid a statute of limitations." *Vroman v. Brigano*, 346 F.3d 598, 602 (6th Cir. 2003) (citations omitted); *see also Searcy v. Carter*, 246 F.3d 515, 519 (6th Cir. 2001) *cert. denied*, 534 U.S. 905 (2001); *DiCenzi v. Rose*, 452 F.3d 465, 468 (6th Cir. 2006). As such, Torrez is not entitled to statutory tolling.

Therefore, unless equitable tolling is appropriate or Torrez is entitled to begin calculating the statute of limitations from an alternative date, his petition would be time-barred.

## B.   Factual Predicate

Pursuant to 28 U.S.C. § 2244(d)(1)(D), the statute of limitations may commence later than the date when a petitioner's conviction became final if "the factual predicate of the claim or claims presented" was not discovered by a petitioner, acting with due diligence, until a later date. In his response, Torrez references the following evidence: (1) Rodriguez's statement to police that identified Mercado as the shooter; and, (2) Colton's tape recorded conversation with Sanchez from May of 2005 wherein, contrary to his trial testimony, Colton identified Mercado as the gunman.

Torrez, and his trial counsel, clearly knew about Rodriguez's statement prior to trial as they

-33-

sought to procure his testimony.  After failing to locate him, they sought to introduce this statement.[19]  As such, Rodriguez's police statement does not justify a later starting date for the statute of limitations.  With respect to Colton's revised account of events, the Court will assume for the sake of argument that: (1) Torrez did not discover it, despite acting with due diligence, until July of 2005; and, (2) the discovery of this information is sufficient under § 2244(d)(1)(D).  Even under such a scenario, Torrez's petition would remain time barred.  The statute of limitations would have commenced on September 30, 2005, when Torrez's state petition was denied.  As such, Torrez would have been required to file his habeas petition by October 1, 2006 to be timely, since there were no intervening applications for collateral review that could have resulted in statutory tolling.  (Doc. No. 8, Exh. 17.)

Therefore, unless equitable tolling is appropriate, his petition would be time-barred.

## C.    Equitable Tolling

The party seeking equitable tolling bears the burden of establishing two elements: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."  *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005); *see also Griffin v. Rogers*, 308 F.3d 647, 653 (6th Cir. 2002).  The United States Supreme Court has "allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass."  *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990).  However, the Supreme Court is "much less forgiving ... where the claimant failed

---

[19]  The trial court declined to admit the statement on hearsay grounds, a ruling which Torrez unsuccessfully challenged on direct appeal.

-34-

to exercise due diligence in preserving his legal rights." *Id*. Furthermore, equitable tolling should be used sparingly. *See, e.g.*, *Cook v. Stegall*, 295 F.3d 517, 521 (6th Cir. 2002) "Typically, equitable tolling applies only when a litigant's failure to meet a legally-mandated deadline unavoidably arose from circumstances beyond that litigant's control." *Id*. at 560-561; *accord Jurado v. Burt*, 337 F.3d 638, 642 (6th Cir. 2003); *Garrison v. Warren Corr. Inst.*, 1999 U.S. App. LEXIS 13314 (6th Cir. Jun. 10, 1999). A petitioner who waits several years before pursuing his legal rights cannot be said to be acting with due diligence.

**D. Actual innocence**

Torrez argues that AEDPA's statute of limitations should be tolled because he is actually innocent. In *Souter v. Jones*, 395 F.3d 577, 588 (6th Cir. 2005), it was held that "equitable tolling of the one-year limitations period based on a credible showing of actual innocence is appropriate." 395 F.3d at 599 (following *Schlup v. Delo*, 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1998)). In such cases, a petitioner must "support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 298. The *Souter* Court ruled that "where an otherwise time-barred habeas petitioner can demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying constitutional claims." 395 F.3d at 602. This standard is consistent with "AEDPA's central concern that the merits of concluded criminal proceedings not be revisited in the absence of a

-35-

strong showing of actual innocence." *Id*. at 600.[20]

### 1.  "New" Evidence

First, this Court must address the issue of whether the evidence put forth by Torrez constitutes "new" evidence under the *Schlup* standard.  The precise contours of what constitutes "new" evidence for the purposes of an actual innocence gateway claim has not been defined by the Sixth Circuit Court of Appeals.  *Plaza v. Hudson*, 2008 U.S. Dist. LEXIS 102083 (N.D. Ohio Dec. 17, 2008).  Other Circuit Courts are split on the issue.  *See Mubang v. United States*, 2011 U.S. Dist. LEXIS 88106 at n. 8 (D. Md. Aug. 9, 2011) ("Circuits disagree over whether 'new evidence' in the actual innocence context must be 'newly discovered' or merely 'newly presented.'")

Some courts have found that "evidence is only 'new' if it was 'not available at trial and could not have been discovered earlier through the exercise of due diligence.'" *Osborne v. Purkett*, 411 F.3d 911, 920 (8th Cir. 2005) (citations omitted); *Hubbard v. Pinchak*, 378 F.3d 333, 340 (3rd Cir. 2004) (finding that defendant's own testimony, which he chose not to proffer at trial, was not "new" under the *Schlup* standard because it was available at trial).  However, other courts have found that new evidence simply means evidence that was not presented and that it need not be "newly discovered" evidence.  In *Gomez v. Jaimet*, 350 F.3d 673 (7th Cir. 2003), the Respondent

---

[20]  Respondent argues that Torrez, even if he had a tenable actual innocence claim, must have been diligent in pursuing his claim to justify the tolling of the statute of limitations.  (ECF No. 86 at 4-7.)  The Sixth Circuit has expressly "decline[d] to impose additional requirements upon a petitioner beyond those which the Supreme Court has set forth in its habeas corpus jurisprudence.  As the Court itself has noted, 'claims of actual innocence are rarely successful.'"  *Souter v. Jones*, 395 F.3d 577, 601, n. 16 (6th Cir. 2005).  Respondent points to a recent Supreme Court decision for the proposition that tolling requires diligence by the petitioner.  (ECF No. 86 at 5, *citing Holland v. Florida*, 130 S. Ct. 2549, 2563 (2010)).  However, "the *Holland* Court did not directly address the requirements for equitable tolling in the context of an actual innocence claim."  *Turner v. Romanowski*, 409 Fed. Appx. 922, 926 (6th Cir. 2011).

argued that statements by a co-defendant and the petitioner's own testimony could not be considered "new" because neither was newly discovered (*i.e.*, petitioner was aware of its existence at the time of trial). *Id*. at 679. The *Gomez* Court found that "nothing in *Schlup* indicates that there is such a strict limitation on the sort of evidence that may be considered in the probability determination. All *Schlup* requires is that the new evidence is reliable and that it was not presented at trial." *Id*.; *see also Griffin v. Johnson*, 350 F.3d 956, 963 (9th Cir. 2003) ("[H]abeas petitioners may pass *Schlup*'s test by offering 'newly presented' evidence of actual innocence" and it need not be newly discovered), *cert. denied* 541 U.S. 998 (2004); *Alexander v. Keane*, 991 F. Supp. 329, 339 (S.D.N.Y. 1998) ("New" evidence is not limited to evidence that was unavailable at trial).

Another decision of this District Court observed that "[a]lthough there is conflicting authority on the issue, district courts in this Circuit have held that 'new' evidence means 'newly discovered' evidence -- that is, evidence unavailable to the petitioner at the time of trial -- rather than evidence that was simply not presented to a jury." *Cleveland v. Bradshaw*, 2011 U.S. Dist. LEXIS 3708 (N.D. Ohio, Jan. 14, 2011) (*citing Taylor v. Woods*, 2010 U.S. Dist. LEXIS 20420 at *7 (W.D. Mich. Feb. 5, 2010) (new evidence under *Schlup* is comprised of evidence "that was not known or unavailable" at the time of a defendant's trial or guilty plea); *Connolly v. Howes*, 304 Fed. Appx. 412, 418 (6th Cir. 2008) ("long-lost transcript of an evidentiary hearing that [petitioner] presumably attended" did not constitute "new" evidence under *Schlup*).

The recording of Miguel Colton, taken years after Colton testified against Torrez at trial, is undoubtedly "new" evidence under either standard. On the other hand, Rodriguez's evidentiary hearing testimony is not clearly "new," since the consistent statement he gave in 1990 was known

-37-

at the time of Torrez's 1994 trial.  Nonetheless, the interests of justice in this case are not served by a rule requiring "new"evidence to also be "newly discovered."  Although Torrez clearly knew that Carlos Rodriguez gave a statement to the police indicating that Mercado was the shooter, Rodriguez was unavailable at trial as he could not be located.[21]  Torrez argued that every effort was made to secure the attendance of Carlos Rodriguez at trial, including the issuance of a bench warrant, having an investigator wait for Rodriguez outside his home, and contacting Rodriguez's friends and family.  (ECF No. 9, Tr. 423.)  Although Torrez sought to introduce Rodriguez's statement to police *in lieu* of his live testimony when he could not be located, the trial court found that the Ohio Rules of Evidence prohibited the admission of the statement.  (*Id*., Tr. 423-24, 428-29.)

Whether or not the content of Rodriguez's evidentiary hearing testimony is newly discovered, it was undoubtedly unavailable at trial through no fault of Torrez or his counsel.  The Court fails to see how the interests of justice are served by excluding evidence that was unavailable at trial from the category of "new reliable evidence" under the *Schlup* standard simply because it was not newly discovered.  Had the statement and identity of Rodriguez remained a mystery until after Torrez's trial, there would be no doubt that his testimony would constitute "new" evidence.  Given that the *Schlup* decision was concerned with preventing fundamental miscarriage of justice, this Court sees no logic in differentiating between evidence that was (1) known but unavailable through no fault of the defense, and (2) evidence that came to light subsequent to trial.  A technical requirement

---

[21] Torrez argues that the prosecution, through Detective Reese, knew that Rodriguez was in Florida, but failed to disclose as much.  (ECF No. 85 at 26.)  At the evidentiary hearing, Rodriguez testified that Detective Reese knew he left the state.  (ECF No. 83, Tr. 178.)  It does not necessarily follow, however, that Detective Reese knew where to locate Rodriguez.

mandating that any new evidence be newly discovered could perpetuate a fundamental miscarriage of justice rather than prevent it. In the absence of any binding authority to the contrary, this Court declines to impose such a requirement.

For largely the same reasons, the Court finds that Mercado's evidentiary hearing testimony also constitutes new evidence under the *Schlup* standard. Mercado was subpoenaed and brought to the Cuyahoga County Jail during Torrez's trial so that he could testify. (ECF No. 9, Tr. 424.) However, defense counsel told the trial judge that he was not going to call Mercado as a witness because "he is less than cooperative due to the fact that he has a parole board [hearing] in the next few years [and] he absolutely indicates to us that he is going to plead the 5th Amendment." (*Id.*, Tr. 424-25.) While the substance of Carlos Rodriguez's testimony was unavailable because he could not be located, the substance of Mercado's testimony was also unavailable to Torrez.

Finally, this Court finds that none of the testimony of the remaining witnesses called by Torrez can be classified as new evidence under the *Schlup* standard. There is no indication that Mark Greene, Rita Morles, Arturo Ramos, Elena Ramos, or Edgar Hernandez were sought out by Torrez to testify at trial.[22] Other than Mark Greene, the remaining witnesses are either friends or family members of Torrez who presumably would have testified on his behalf if called upon at trial. There is no evidence of record to suggest that any of these witnesses were unavailable at the time of Torrez's trial in 1994. As such, the testimony of these witnesses will only be considered if Torrez establishes that the new evidence he has presented to this Court is also reliable.

---

[22] The testimony of Nestor Martinez and Jacci Torrez have no direct bearing on the guilt or innocence of Torrez, and they appear to have been called to testify primarily to establish the chain of custody of the audio recording made by Fidel Sanchez.

### 2.  "Reliability" of the New Evidence

In addition to being "new" within the meaning of *Schlup*, evidence supporting an actual innocence gateway claim must include "reliable evidence--whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial."  *Connolly v. Howes*, 304 Fed. Appx. 412, 417 (6th Cir. 2008) (*quoting Schlup*, 513 U.S. at 324).  The Sixth Circuit has observed that "[a]lthough the examples of new evidence cited in *Schlup* "were not meant to be an exhaustive list of everything upon which an actual innocence claim may be based," *Souter*, 395 F.3d at 595 n.8, "the *Schlup* standard is demanding and permits review only in the 'extraordinary' case."  *Connolly*, 304 Fed. Appx. at 417 (*citing House*, 547 U.S. at 538).  Herein, the "new" evidence presented by Torrez consists of alleged eyewitness testimony of Rodriguez, the exculpatory testimony of co-defendant Mercado, and the purported audio recording of Miguel Colton that contradicts his trial testimony.

First, the Court considers the evidentiary hearing testimony of Carlos Rodriguez.  The Court finds the testimony of Rodriguez to be reliable for the following reasons.  He is the most credible eyewitness to the shooting of Owens, because (1) he is a largely disinterested witness who lived where the shooting occurred; (2) he was not affiliated with any gang; (2) he apparently does not have a criminal record and has worked with the Cuyahoga County Sheriff's Department; (3) he called 911 immediately to report the shooting; (4) he cooperated with the police investigation giving a timely statement identifying Mercado as the shooter; (5) his testimony is consistent with his previous statement; (6) he was familiar with both Mercado and Torrez at the time of the shooting; and (7) the circumstances leading to his evidentiary hearing testimony indicate that he

was not testifying in an attempt to help Torrez.[23]  Though Respondent contends that Rodriguez's testimony is neither new nor reliable, Respondent's argument, in actuality, only challenges whether the testimony is "new."  (ECF No. 86 at 9-11.)  Respondent has not made any argument as to why Rodriguez's testimony should be considered unreliable.

With respect to Mercado's testimony, Respondent asserts that it is unreliable because Mercado had nothing to lose by admitting that he was the shooter, as double jeopardy prevents him from being charged again in connection with the death of Owens.  (ECF No. 86 at 16-17.)

Although the Court agrees with Respondent and the law cited in his brief that a co-defendant's testimony is inherently suspect, especially where the co-defendant is immune from further prosecution or punishment, Mercado's admission that he was the shooter is reliable for two reasons.  First, while Mercado may have had nothing to lose by testifying that he was the shooter, he also had nothing to gain.  Mercado clearly had no desire to help Torrez by testifying.  This can be inferred from the fact that: (1) Mercado indicated to Torrez's counsel that he would invoke his 5th Amendment right if called to testify at Torrez's trial because he had an imminent parole hearing at the time; (2) Torrez has been in prison since 1994 yet Mercado never came forward to admit being the shooter; (3) the palpable indifference Mercado displayed during his testimony to Torrez's extended incarceration; and (4) his candid admission that he was only in court because he was subpoenaed.[24]  Based on Mercado's testimony, demeanor, and criminal record, it is clear that

---

[23]  With respect to the latter two points, it bears noting that Rodriguez identified Mercado as the shooter despite the fact that he had known him for years and was friendly with Mercado's family, especially his brother Benny.  (ECF No. 83, Tr. 179-80.)  By comparison, he had known Torrez less than a year.  *Id.*

[24]  When asked by Respondent's counsel why he did not come forward until now, Mercado stated as follows: "Let me explain it like this.  If you never subpoenaed me, you

-41-

he can be counted on only to act selfishly in his own best interests and without regard for others. As such, in an admittedly ironic twist, the veracity of Mercado's admission is buttressed by his clear ambivalence towards Torrez's fate. Therefore, the Court finds it unlikely that Mercado's testimony was an attempt to deceive the Court in order to aid Torrez. Second, the Court need not consider Mercado's testimony in isolation. The reliability of his admission that he was the shooter is buttressed by Rodriguez's testimony, Torrez's trial testimony, and the audio recording of Colton. As to Respondent's second argument – that Mercado's testimony is unreliable because it conflicts with Torrez's trial testimony – the Court agrees that there are some conflicts and/or inconsistencies on other points unrelated to who pulled the trigger. This does not, however, render Mercado incredible on the key issue of who shot Owens.

Finally, the Court was also presented with new evidence in the form of an audio recording allegedly taken of Miguel Colton by Fidel Sanchez while both were imprisoned at the Lake Erie Correctional Institute.[25] As to the authenticity of the tape, the creator, Sanchez, testified at the evidentiary hearing. He identified the tape played during the hearing as the recording of a conversation he had with Colton. (ECF No. 83, Tr. 17-21.) Torrez's brother, Nestor Martinez, also testified that he recognized Colton's voice on the recording. (ECF No. 83, Tr. 105.) Although Torrez bears the burden of establishing entitlement to habeas relief, Respondent has not offered any evidence that calls into question whether the voice heard on the tape recording is that of Colton, arguing only that the criminal convictions of Sanchez and Martinez affect their

---

would never have seen me." (ECF No. 83, Tr. 147.)

[25] Efforts made by the United States Marshals to locate Colton for the evidentiary hearing were unsuccessful. (ECF No. 83, Tr. 115-16.)

credibility.  (ECF No. 86 at 11.)  The Court finds that ample evidence has been presented to demonstrate the authenticity of the recording.  Sanchez testified that he did not know Torrez prior to his incarceration; that he believed Torrez when the latter stated that he did not shoot Owens; and, that he overheard Colton talking about Torrez's case.  (ECF No. 83, Tr. 14-16.)  He testified that nobody asked him to make the recording or promised him anything for doing so.  (*Id*., Tr. 28-29.)  Although Sanchez's testimony revealed that he had some issues with his memory, his lapses did not appear to be designed to obscure or hide any information and involved primarily an inability to pinpoint dates, which, given the passage of time, is not unexpected.

Thus, if the Court accepts that the audio recording is of Colton, the question remains whether Colton's statement therein is reliable.  Respondent argues that recanted testimony is disfavored. *See, e.g.*, *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. Ohio 2001) ("recanting affidavits are always viewed with 'extreme suspicion'") (*citing United States v. Chambers*, 944 F.2d 1253, 1264 (6th Cir. 1991)).  It is apparent from the audio recording and the circumstances described by Sanchez that Colton was completely unaware that his conversation with Sanchez was being recorded.[26]  Thus, the Court does not consider the statement to be recanted testimony.  Colton was a fellow gang member of the victim Owens at the time of the shooting.  It is not inconceivable that he wanted to ensure that Torrez went to prison along with Mercado.  Colton's spontaneous statements to a prison inmate could be construed as more truthful than his statements made in open court.  Adding to the potential reliability of Colton's statement is its consistency with the

---

[26]  At the onset of the taped conversation, which abruptly interrupts the music that is on the tape, Colton can be heard asking Sanchez "what's up with the music?"  (Petitioner's Exh. A.)  Sanchez responds that he is "rewinding it ... "  *Id*.  As such, Sanchez obviously did not want Colton to know the conversation was being recorded.

-43-

testimony of Rodriguez and Alicea.  In the audio recording, Colton noted that Turner did not see anything and had to be told what happened.  (Petitioner's Exh. A.)  Alicea expressly denied that Turner was present at the time of the shooting (though he indicated Turner was "probably walking down the street because he had a big limp.")  (ECF No. 84, Tr. 329-36; Petitioner's Exh. FF.) Rodriguez makes no mention of Turner who, due to his large size, would, by his own admission, be difficult to overlook.  (ECF No. 83, Tr. 174-88; ECF No. 84, Tr. 279.)

In sum, the Court finds that it has been presented with both new and reliable evidence under the *Schlup* standard.

### 3. Consideration of All Evidence[27]

The United States Supreme Court has noted that *Schlup* requires the habeas court to consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial" when determining whether a reasonable juror would have convicted the defendant in light of the new evidence. *House v. Bell*, 126 S. Ct. 2064, 2077 (2006) (internal quotations omitted); *accord Connolly*, 304 Fed. Appx. at 417; *Rickard v. Wolfe*, 2007 U.S. Dist. LEXIS 92447 (N.D. Ohio Dec. 17, 2007). Therefore, this Court must consider all the evidence of record.  This includes the evidence presented at Torrez's trial in 1994 as well as the evidence presented at the evidentiary hearing. Furthermore, while the rules of evidence may impact the weight this Court accords certain evidence, they do not bar this Court's consideration of evidence that may otherwise be inadmissible at a trial.

---

[27]  While the Court has found the testimony of Rodriguez, Mercado, and the taped statement of Colton are each new and reliable evidence, only one such finding is necessary to reach the next step of considering all the evidence.

It is also worth noting that an actual innocence review differs significantly from a sufficiency of the evidence review.

> The *Jackson* standard [which addresses the sufficiency of the evidence] ... differs in at least two important ways from the *Carrier* standard [which addresses actual innocence].  First, under *Jackson*, the assessment of the credibility of witnesses is generally beyond the scope of review.  In contrast, under the gateway standard we describe today, the newly presented evidence may indeed call into question the credibility of the witnesses presented at trial.  In such a case, the habeas court may have to make some credibility assessments.  Second, and more fundamentally, the focus of the inquiry is different under *Jackson* than under *Carrier*.  Under *Jackson*, the use of the word "could" focuses the inquiry on the power of the trier of fact to reach its conclusion.  Under *Carrier*, the use of the word "would" focuses the inquiry on the likely behavior of the trier of fact.

*Schlup*, 513 U.S. at 330.

### a.  Actual Innocence as Principal Offender

Carlos Rodriguez, the most credible witness, unequivocally identified Mercado as the shooter.  Mercado himself admitted to being the shooter.  Though a reasonable juror might be skeptical of the testimony of a co-defendant who faced no further punishment for such an admission, it is buttressed by the testimony of Rodriguez, Torrez himself, and the tape recording of Colton.

While Turner testified that Torrez was the shooter – this Court is skeptical that a reasonable juror would believe his testimony beyond a reasonable doubt because, given the new evidence, there is a significant dispute as to whether Turner was in a position to observe the shooting.  Colton's recorded audio statement indicates that Turner was not present.  Rodriguez omits any mention of Turner in both his police statement and evidentiary hearing testimony.  Finally, although Alicea also identified Torrez as the shooter, he too indicates that Turner was not on the

scene at the time of the shooting.[28]  Furthermore, at trial, Turner testified that he was on the sidewalk along with Colton and Alicea, facing the passenger side of the car, and was separated from the victim who was on the driver's side of the car.  (ECF No. 9, Tr. 142-43.)  At the evidentiary hearing, Turner stated the exact opposite, claiming that he was facing the driver's side of the car (*i.e.,* same side as the victim.)  (ECF No. 84, Tr. 289.)  This is a glaring inconsistency.  Turner's testimony is also inconsistent as to whether he knew Torrez and Mercado prior to the shooting.

Colton was the only other witness at trial who identified Torrez as the shooter.  Later, he told a fellow prison inmate that Mercado was the shooter.  Confronted with this about face, a reasonable juror would likely have disregarded or significantly discounted Colton's testimony due to his two materially inconsistent accounts.  Finally, while Alicea's testimony identifying Torrez as the shooter could offer another eyewitness account that supports a conviction as the principal offender, there are aspects of Alicea's testimony that would cause a reasonable juror to doubt his veracity.  For one, he had initially lied in his police statement regarding whether he and the victim were members of a gang.  (ECF No. 84, Tr. 336-37; Respondent's Exhs. 9a & 9c.)  Second, there is no indication that he had a comparable level of familiarity with Mercado and Torrez as Rodriguez did.  His bias as a fellow gang member of the victim would also likely have troubled a reasonable juror.  Finally, his demeanor on the witness stand caused the Court great concern.

Given all the evidence, this Court does not believe that a reasonable juror would more likely than not have found Torrez guilty as the principal offender.  Nonetheless, this determination does

---

[28]  Alicea unambiguously stated that Turner would be "lying" if he said that he, instead of Alicea, caught Owens after he was shot.  (ECF No. 84, Tr. 336.)

not end the analysis.

### b.  Actual Innocence as Aider and Abettor

Respondent asserts that even if Torrez was not the shooter (*i.e.* the principal offender), a reasonable juror could have found him guilty as an aider and abettor.[29]  (ECF No. 86 at 35-37.)  At the conclusion of Torrez's trial, the court included a jury instruction on aiding and abetting.  (ECF No. 9, Tr. 512-13.)  As Torrez himself admitted to being the driver of the car when the shooting occurred, the question remains whether the factual dispute over who actually pulled the trigger is material.  If Torrez cannot demonstrate that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt as an aider or abettor, his actual innocence argument would fail – even if he was not the principal offender.

An individual "who aids and abets another in committing an offense is guilty of the crime of complicity, and may be prosecuted and punished as if he were the principal offender."  *State v. Graven*, 369 N.E.2d 1205, 52 Ohio St. 2d 112, 115 (Ohio 1977).  Pursuant to O.R.C. § 2923.03:

> (A)  No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:
>
> (1) Solicit or procure another to commit the offense;
>
> (2) Aid or abet another in committing the offense;
>
> (3) Conspire with another to commit the offense in violation of section 2923.01 of the Revised Code;
>
> (4) Cause an innocent or irresponsible person to commit the offense.

---

[29]  Respondent's argument that a reasonable juror "could" find Torrez guilty as an aider or abettor is not consistent with the actual innocence test after new and reliable evidence has been introduced.  The question, rather, is whether, based upon all the evidence, it is more likely than not that no reasonable juror *would* have found him guilty beyond a reasonable doubt.

(B)   It is no defense to a charge under this section that no person with whom the accused was in complicity has been convicted as a principal offender.

***

(F)   Whoever violates this section is guilty of complicity in the commission of an offense, and shall be prosecuted and punished as if he were a principal offender.  A charge of complicity may be stated in terms of this section, or in terms of the principal offense.

"Ohio's complicity statute, O.R.C. 2923.03, does not provide a definition of the terms 'aid or abet.' ...  Black's Law Dictionary defines 'aid and abet' as 'to assist or facilitate the commission of a crime, or to promote its accomplishment.' Black's Law Dictionary (7 Ed.Rev.1999) 69." *State v. Johnson*, 93 Ohio St. 3d 240, 243, 754 N.E.2d 796 (Ohio 2001).  "[T]he mere presence of an accused at the scene of a crime is not sufficient to prove, in and of itself, that the accused was an aider and abettor."  *State v. Widner*, 69 Ohio St. 2d 267, 269, 431 N.E.2d 1025, 1027 (Ohio 1982).  "This rule is to protect innocent bystanders who have no connection to the crime other than simply being present at the time of its commission."  *Johnson*, 93 Ohio St.3d at 243.  The *Johnson* court expressly agreed with the proposition that "participation in criminal intent may be inferred from presence, companionship and conduct before and after the offense is committed."  *Johnson*, 93 Ohio St.3d at 245 (*quoting State v. Pruett*, 28 Ohio App. 2d 29, 34, 273 N.E.2d 884, 887 (Ohio Ct. App. 1971)).  The *Johnson* court held that to support a conviction for complicity by aiding and abetting "the evidence must show that the defendant supported, assisted, encouraged, cooperated with, advised, or incited the principal in the commission of the crime, and that the defendant shared the criminal intent of the principal.  Such intent may be inferred from the circumstances surrounding the crime."  93 Ohio St.3d at 245-46; *accord In re T.K.*, 849 N.E.2d 286, 109 Ohio St. 3d 512, 514 (Ohio 2006); *State v. Perez*, 2011 Ohio App. LEXIS 3338, 2011-Ohio-3983 at ¶18

-48-

(Ohio Ct. App., Aug. 11, 2011).[30]

Respondent argues that the following evidence would allow a reasonable juror to find Torrez guilty beyond a reasonable doubt: Torrez knew Mercado was "mingling with the weapon" at Mark Greene's house prior to the shooting (ECF No. 9, Tr. 347, 382); Torrez willingly accompanied Mercado into a rival gang's territory and engaged in provocative behavior by "tagging" walls – a recognized sign of disrespect that foreseeably could result in a violent confrontation; Torrez drove aggressively towards rival gang members in the street and stopped the vehicle instead of proceeding onwards; Torrez, drove the getaway car after the shooting (ECF No. 9, Tr. 337); and, Torrez spent a large potion of the evening with Mercado, to include acting as a lookout while Mercado made the car appear as if it had been stolen.  (ECF No. 9, Tr. 339, 398, 412; ECF No. 83, Tr. 152-53, 192-93, 197-98, 207-09.)

Torrez, however, correctly asserts that the State, at trial, consistently maintained that he was the principal offender.  Mr. Bombik, the prosecutor, testified at the evidentiary hearing that he believes Torrez pulled the trigger.  (ECF No. 83, Tr. 55, 57.)  This, perhaps, explains why Mercado was allowed to plead guilty to voluntary manslaughter.  Nonetheless, under O.R.C. § 2923.03(B), "[i]t is no defense to a charge [of complicity] that no person with whom the accused

---

[30]  The jury instructions regarding aiding and abetting given at Torrez's trial were consistent with Ohio law.  (ECF No. 9, Tr. 512-14.)  The court defined aiding and abetting as "[w]hen two or more persons have a common purpose to commit a crime, and when one does one part and the other person performs the other part, this constitutes aiding and abetting."  *Id*. at 512.  The trial court, however, cautioned that "the mere fact that a person is present when a criminal act is committed does not make him as [sic] an aider and abettor unless he does some overt act in furtherance of the crime charged in the indictment."  *Id*. at 512-13.  The court defined aiding as assisting or strengthening, and abetting as encouraging, counseling, inciting, or assisting.  *Id*. at 513.  The court also explained the definition of "purposely" and indicated that evidence of aiding and abetting can be either direct or circumstantial.  *Id*. at 513-14.

-49-

was in complicity has been convicted as a principal offender." It is further irrelevant that Torrez was charged with murder and not complicity, as "a charge of complicity may be stated in terms of [the complicity statute], or in terms of the principal offense." O.R.C. § 2923.03(F); *see also State v. Parker*, 2011 Ohio App. LEXIS 973 at ¶17 (Ohio Ct. App., March 10, 2011).

Torrez also maintains that there was no evidence offered at trial that he was guilty of aiding and abetting. (ECF No. 83 at 31.) However, Torrez's intent to assist Mercado in the crime could be inferred from the circumstances both before and after the shooting. Therefore, Torrez's own testimony and that of the other eyewitnesses at trial could, and probably would, support a conviction. Moreover, in conducting this *Schlup* inquiry, the Court is not limited to the evidence that was actually before the jury, as a petitioner is not entitled to have the Court consider only the new evidence that is favorable to him while ignoring evidence that is consistent with guilt. *House v. Bell*, 126 S. Ct. 2064, 2077 (a habeas court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial").

Torrez argues that he was merely present at the shooting, and cites Mercado's testimony that there was no plan to shoot anyone. (ECF No. 83 at 137-39.) Jurors are entitled to believe some parts of a witness's testimony while disbelieving other parts.[31] This Court cannot say that a reasonable juror would find Mercado's testimony – that he never intended to shoot anyone – credible. Finding this an unintentional shooting would be a stretch. Furthermore, Torrez was hardly an innocent bystander who had no connection to the commission of the crime. As indicated

---

[31] The jurors were, in fact, instructed that they could believe or disbelieve all of a witness's testimony or portions thereof. (ECF No. 9, Tr. 509-10.)

above, assistance, support, and cooperation can occur after the offense – not just before.  "Aiding and abetting may also be established by overt acts of assistance such as driving a getaway car or serving as a lookout."  *State v. Lett*, 160 Ohio App. 3d 46, 825 N.E.2d 1158 (Ohio Ct. App. 2005); *accord State v. Coleman*, 2011-Ohio-4564 at ¶9 (Ohio Ct. App., Sept. 12, 2011); *State v. Salyer*, 2007 Ohio App. LEXIS 1513 at ¶26 (Ohio Ct. App., April 29, 2007).  Here, Torrez both drove the car away after the shooting and served as a lookout while Mercado attempted to conceal the crime by making the car appear as if it had been stolen.  *See State v. Widner*, 69 Ohio St.2d 267, 431 N.E.2d 1025 (Ohio 1982) (driver's complicity conviction upheld where the passenger pointed and fired the gun and the driver failed to terminate the flight, but with full knowledge that a firearm was being discharged by the passenger, continued to drive away); *accord State v. Jones*, 2003 Ohio App. LEXIS 5310 at ¶18 (Ohio Ct. App., Nov. 10, 2003).[32]

Torrez claims that there is no evidence proving his intent to aid and abet Mercado in the commission of a crime.  Here both Torrez and Mercado claim that they never intended to kill anyone.  Jurors, however, are permitted to infer an individual's intent to aid and abet from the circumstances surrounding the crime, including their conduct.  A reasonable juror could also infer the following based on all the evidence presented during the trial and the evidentiary hearing: Torrez knew that Mercado was known to carry a gun and may have procured a gun from Mark Greene[33]; Torrez willingly accompanied Mercado into a rival gangs territory and posted

---

[32] It may be unreasonable to expect Torrez to stop the car under the circumstances.  However, he could have subsequently done other things to establish he was not a part of the crime.  Indeed, he chose not to do so, indicating that he did not want to be a "snitch."  (ECF No. 9, Tr. 398.)

[33] A reasonable juror could and, in this Court's opinion, likely would disbelieve Torrez's testimony that he did not know Mercado had a gun.  Torrez knew that Mercado was

-51-

provocative graffiti that at least one witness testified meant "Folks killer"[34]; Torrez, who was the driver, could have taken a different route altogether to avoid the rival gang members on the street but opted not to do so[35]; Torrez tried to run over the rival gang members in the street; Torrez stopped or slowed the car to engage in a violent exchange with the rival gang members when he could have just kept driving; and Torrez spent the remainder of the evening with Mercado despite allegedly having been taken completely by surprise at the "unintentional" shooting.

Ohio courts have upheld an aiding and abetting conviction for aggravated murder where a defendant merely tackled the victim while his cohorts proceeded to beat him to death.  *See, e.g., Ohio v. Duck*, 2011 Ohio App. LEXIS 2563 (Ohio Ct. App., June 20, 2011).  In *Duck*, despite the defendant's assertion that he lacked the intent to purposely cause the victim's death – as illustrated by his attempt to stop the beating and telling a caller to the victim's phone that he needs help – the state appellate court found that the defendant purposely exited the car and tackled the victim resulting in the vicious and deadly encounter.  *Id*.

The Sixth Circuit Court of Appeals, while interpreting Ohio law, has observed that even where there is "no evidence adduced at trial that the petitioner personally *intended* ... to kill [the victim], demonstration of such an intent is not the only manner in which criminal liability may be

---

discussing a gun with Greene on the day of the shooting and he conceded that Mercado was known to carry a gun. (ECF No. 9, Tr. 346-48.)

[34] A reasonable juror was free to disbelieve Torrez's denial that the graffiti could be interpreted as such (ECF No. 9, Tr. 324-25), and believe Colton's testimony on the matter.  (ECF No. 9, Tr. 240-43.)

[35] A reasonable juror could have believed Colton's testimony that Torrez and Mercado disappeared around the corner after leaving the area they were tagging and found that Torrez chose to drive to where the "Folks" were rather than avoid them.  (ECF No. 9, Tr. 228; Respondent's Exh. 9a.)  Even Mercado testified that they stopped tagging when someone began yelling at them.  (ECF No. 83, Tr. 137.)

imposed upon [the petitioner]." *Brown v. Konteh*, 567 F.3d 191, 210 (6th Cir. 2009) (emphasis in original). The Sixth Circuit found that the petitioner could be found liable for aiding and abetting in the murder of the victim where "[he] and his cohorts engaged in an unprovoked attack ... an attack that escalated into a full-blown, strong-arm robbery." *Id*. The Sixth Circuit explained that "[t]he fact that the beating of [the victim] escalated into a shooting death in no way exonerates the petitioner from complicity in the criminal deed, especially given the record evidence that [the petitioner] had to have been aware, at least since the beating of [a different victim], that one of his companions ... was in possession of a handgun." *Id*.

The underlying state appellate court opinion in *Brown* observed that the defendant engaged in a common design with others to rob two brothers by the use of force and violence. 567 F.3d at 210. Furthermore, the victim's murder was "a natural and probable consequence given the force and violence used" during the robbery, leading to "circumstances that in all probability would endanger human life." *Id*. This case is also factually similar to *State v. Widner*, wherein the Ohio Supreme Court found sufficient evidence of aiding and abetting based on the following: there was direct and circumstantial evidence of record from which a juror could infer that defendant knew his brother had a gun; and, the defendant, who was driving the car, did not terminate his flight from the scene when his brother began discharging his weapon towards a police officer. 431 N.E.2d at 1028. Based on these facts, and "the fact that a firearm is an inherently dangerous instrumentality, the use of which is likely to produce death," the *Widner* court concluded that a jury could reasonably infer that the defendant possessed the mental state necessary to support an aiding and abetting conviction for attempted murder. *Id*.

In the case at bar, a reasonable jury would likely find that Torrez intentionally and purposely

engaged in provocative behavior when he entered a rival gang's territory with Mercado, who was known to carry a gun.  They proceeded to "tag" the walls of the neighborhood, which was likely to incite a violent confrontation with a rival gang.  Moreover, a reasonable jury would more likely than not find that Torrez, rather than avoiding rival gang members who happened upon them, purposely drove in their direction and stopped or slowed the car down enough to allow Mercado to shoot Owens from a distance of no more than two feet.  Thus, the violent confrontation that occurred with the rival gang, which directly resulted in the shooting death of Owens, was a natural and probable consequence of Torrez's actions.  This negates his argument that a reasonable juror would more likely than not find that he was merely a bystander.  Torrez has failed to meet his burden to demonstrate that, after considering all the evidence, it is more likely than not that no reasonable juror would have found him guilty of aiding and abetting in the murder of Owens.

Finally, Torrez argues that the jury's actions indicate it did not convict him as an aider and abetter.  (ECF No. 85, Tr. 31.)  In support of this argument, Torrez points out that during deliberations, the jury submitted the following question to the trial judge: "How does aiding and abetting impact upon specification one, one, firearm?" (ECF No. 9, Tr. 556.)  Before receiving an answer, the jury told the trial judge to disregard the question and returned its verdict.  *Id.*  The trial judge indicated that the inference could be drawn from the jury's behavior that it believed Torrez was the shooter.  *Id.*  This point is of no consequence.  First, this Court declines to engage in any attempt to divine whether the jury found Torrez guilty as the principal or on an aiding and abetting theory.  Second, under the *Schlup* standard, the dispositive question is whether a reasonable juror *would* convict the defendant in light of both new and old the evidence.  Therefore, assuming *arguendo* that the jury thought Torrez was the shooter (*i.e.* the principal offender), such a decision

-54-

would not foreclose the likelihood that a reasonable juror would find him guilty of aiding and abetting had the new evidence been heard as well.

Based upon the all the evidence of record, both old and new without regard to admissibility, this Court cannot find that it is more likely than not that no reasonable juror would have found Torrez guilty beyond a reasonable doubt of aiding and abetting the murder of Owens.

The Court recognizes that there is a large degree of inequity in Torrez serving his seventeenth year in prison while the likely principal offender, Mercado, served only nine years.  Nonetheless, this Court is constrained by the law to recommend the dismissal of Torrez's habeas petition.

Without the benefit of statutory tolling, equitable tolling, or a finding of a credible claim of actual innocence, the instant petition is untimely.

## V.  Conclusion

For the foregoing reasons, it is recommended that Torrez's Petition be DISMISSED as untimely.

<div style="text-align:right">/s/ <em>Greg White</em><br>U.S. Magistrate Judge</div>

Date: <u>October 27, 2011</u>

**<div style="text-align:center">OBJECTIONS</div>**
**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**