**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PABLO TORREZ,** | ) | **CASE NO.  1:10 CV 576** |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE DONALD C. NUGENT** |
| | ) | |
| **RICHARD GANSHEIMER, WARDEN,** | ) | **Magistrate Judge Greg White** |
| | ) | |
| **Respondent.** | ) | **MEMORANDUM OPINION** |

This matter is before the Court on the Report and Recommendation issued by Magistrate Judge Greg White.  (Docket #89).  On March 17, 2010, Petitioner, Pablo Torrez, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  (Docket #1.)  The Magistrate Judge recommends that the Petition be dismissed as untimely.

**Factual and Procedural Background**

As set forth by the Magistrate Judge, the factual and procedural history of this case is as follows:

**I. State Court's Summary of the Facts**

The state appellate court summarized the facts underlying Torrez's conviction as follows:

On that day, Miguel Colton, Derrick Turner (a.k.a. "Bear"), Alphonso Alescia and the victim, Brian Owens (a.k.a. "Zone"), all members of a gang known as the "Folks," met at a friend's house on W. 81st Street near Madison Avenue in Cleveland to lift weights.

At approximately 6:00 p.m., a girl known to them as "Smurf" appeared at the house and notified them that some members of a rival gang were "tagging" in their neighborhood. The Folks members understood this to mean that the rival gang's members were putting graffiti "disrespectful" of their gang on a wall. The Folks decided to investigate the report.

As they left the house, they walked northward on W. 81st Street. From their vantage point, they saw W. 81st Street's intersection with Madison Avenue and observed two men, later identified as Jose "Chaz" Mercado and appellant, spray painting a wall of one of the buildings located there. Mercado and appellant were putting symbols on the wall which indicated their names, their gang affiliation, and the words "Folks Killers." As the four Folks continued to walk toward them, Mercado and appellant stopped what they were doing and ran, disappearing from view.

The four Folks began to cross W. 81st as they approached Guthrie Avenue, a side street just south of Madison. The victim, Owens, was close to the west side of the street when suddenly a burgundy car with Mercado driving and appellant in the front seat "flew around the corner" of Guthrie onto W. 81st and came at them.  Alescia and Colton quickly jumped back to the east side of W. 81st; Turner, who was on crutches, was still on the sidewalk a little distance behind Alescia and Colton.

The car slowed as the Folks members separated. When it did so, Owens approached it and began fighting with Mercado through the open driver's side window. The two were exchanging punches as Colton threw rocks at the still-rolling car.

While this was occurring, appellant suddenly began "bouncing around in the car."  He "got up on [his] seat" as he "turned around" to the back seat and "started looking for something." When he turned back again, Alescia shouted to his friends to get away. Colton obeyed; however, Owens, who was continuing to grapple with Mercado "didn't have no time." Appellant "reached over [Mercado] and shot Zone" at close range in the chest. Then the car sped away.

Owens stood for a moment, apparently in shock, then screamed. At that, Turner dropped his crutches and went forward as fast as he was able to catch Owens as the victim collapsed. Turner supported Owens the short distance to Alescia, who stood in a nearby driveway. Then, at Colton's

direction, Turner left to inform other gang members of the incident by appropriating a bicycle and pedaling away with one leg.

Shortly thereafter, police and EMS responded to the scene. Owens was transported to the hospital, where he was pronounced dead at 6:42 p.m. A detective of the Cleveland Police Department's Scientific Investigation Unit ("SIU") took photographs of the crime scene.

Detective Reese, who arrived at the scene at approximately 7:45 p.m., interviewed some witnesses and also discovered that Alescia and Colton had been taken to the First District police station; therefore later that night Reese spoke to them. Thus, he obtained information about the suspects involved in the shooting and their car.

The following day, Mercado was arrested. That same day, at two separate times, police officers took photographs of the wall appellant and Mercado had been seen spray-painting. By the time the second set of photographs were taken, Folks members had painted over their rivals' graffiti.

The autopsy of Owens revealed he had expired from internal bleeding after a single gunshot wound to the left chest, despite medical efforts to save his life.  From the fouling and stippling surrounding the wound, the assistant coroner who performed the autopsy determined a muzzle-to-target distance of between six inches and two feet.

On October 1, 1990, Mercado and appellant were indicted together for aggravated murder, R.C. 2903.01, with a firearm specification. The record reflects Mercado was eventually convicted of voluntary manslaughter in connection with the shooting. However, despite the creation of a composite drawing based on witness' descriptions and a capias for his arrest, police efforts to locate appellant were unavailing. So too were efforts to locate Turner.

The capias on appellant was finally returned on April 26, 1994. At his arraignment, appellant entered a plea of not guilty to the aggravated murder charge.

Appellant's trial commenced on July 11, 1994. On that day, the prosecutor notified the trial court on the record that Colton had just informed him that there was a possibility Turner could be located. The prosecutor thus informed both the court and the defense that if Turner was found he would be called as a witness.  Defense counsel objected.

The prosecution then presented its case-in-chief, calling the following as its witnesses: 1) Dr. Challener, the assistant county coroner who

-3-

performed the autopsy on Owens; 2) Det. Reese; 3) Bonnie Rudolph, the SIU detective who had taken the photographs of the crime scene after Owens was transported to the hospital; 4) Derrick Turner; and 5) Miguel Colton. The state also introduced the following exhibits into evidence: 1) the autopsy protocol, 2) photographs taken of the victim at the assistant coroner's direction; 3) the photographs taken of the crime scene; 4) photographs of the spray-painted wall; and 5) a photograph of Mercado taken for identification purposes.

Appellant then made a Crim.R. 29 motion for acquittal. The trial court granted the motion with respect to the charge of aggravated murder; the court ruled the state had failed to provide sufficient evidence on the element of prior calculation and design. Thus, trial proceeded on the lesser-included charge of murder, R.C. 2903.02, with a firearm specification.

Appellant testified in his own behalf. His version of the details of the shooting differed from the version described by Turner and Colton.

Appellant admitted that in September 1990 he had been a member of a gang known as the "Rice and Beans," a junior part of a gang called the "Kings" who were rivals of the Folks. He stated on the day of the shooting, he had been driving around with Mercado, who was already a "King," initially submitting job applications and, later, spray-painting walls. Appellant testified that his gang did not engage in any violent activities and denied that the symbols he painted had either any meaning or portrayed any threats to other gangs. According to appellant, however, the painting was a form of initiation to the Kings.

Appellant testified that although the car was Mercado's, he and Mercado took turns driving it and also took turns spray-painting. He further stated he was driving after painting the wall at Madison and W. 81st, he turned the corner at Guthrie and W. 81st about twenty minutes later, he was proceeding slowly, and the Folks suddenly stepped out from between cars and began throwing "bricks" at them. Appellant testified he "ducked," heard a sound "behind his head," and realized Mercado had "popped a shot." He stated he did not know Mercado had pulled out a gun until they had left the area. Appellant also testified that after he found out about Owens' death, he went to live in another state because he was "afraid" of Mercado.  State v. Torrez, 1995 Ohio App. LEXIS 3479 at **1-8 (Ohio Ct. App., Aug. 24, 1995) (footnotes omitted).

Although factual determinations made by state courts are "presumed to be correct" in habeas corpus proceedings, Torrez challenges this factual history. See

-4-

28 U.S.C. § 2254(e)(1); House v. Bell, 283 F.3d 37 (6th Cir. 2002). Indeed, testimony at the evidentiary hearing conducted in 2011 conflicts with the above factual determinations made by the state appellate court.

## II. Procedural History

### A. Conviction

In September of 1990, the Cuyahoga County Grand Jury charged Torrez with one count of aggravated murder in violation of Ohio Revised Code ("O.R.C.") § 2903.01 together with a firearm specification. (ECF. No. 8, Exh. 1.)

On April 27, 1994, Torrez, after over three years on the lamb, pled "not guilty" and the matter proceeded to a jury trial. (ECF No. 8, Exh. 2.) At the close of the prosecution's case, Torrez moved for a judgment of acquittal pursuant to Ohio Criminal Rule 29. (ECF No. 8, Exh. 3.) Torrez's motion was granted as to the charge of aggravated murder, and the trial continued on the reduced charge of murder in violation of O.R.C. § 2903.02. Id. Torrez was convicted of murder and the firearm specification. (ECF No. 8, Exh. 4.) On July 29, 1994, the trial court sentenced Torrez to an indefinite term of fifteen years to life to be served consecutively with a three year term for the specification. (ECF No. 8, Exh. 5.)

### B. Direct Appeal

On August 12, 1994, Torrez, through counsel, filed a Notice of Appeal with the Court of Appeals for the Eighth Appellate District ("state appellate court") raising the following assignments of error (ECF No. 8, Exh. 6) :

1. The trial court abused its discretion in permitting the testimony of DERRICK TURNER (a.k.a. "BEAR"), whose name was not provided counsel for Defendant/Appellant prior to trial.

2. Permitting a composite sketch of the alleged assailant to be shown to witnesses without a proper foundation was an abuse of discretion by the trial court, highly prejudicial to the Defendant/Appellant, and reversible error.

3. It was error for the trial court to permit the Plaintiff/Appellee to introduce the Coroner's photograph (Exhibit 3) depicting surgery performed on the victim.

4.      It was Prosecutorial misconduct and an abuse of discretion by the trial court to permit questioning of Defendant/Appellant about his prior employment.

5.      The trial court erred in failing to direct a verdict of acquittal and by allowing the verdict to stand which was not supported by the weight of the evidence.

6.      The conviction of Defendant/Appellant is against the manifest weight of the evidence.

7.      The trial court erred in refusing to allow the admission of CARLOS RODRIGUEZ, JR.'s statement when the witness was unavailable.

(ECF No. 8, Exh. 7.)

On August 24, 1995, Torrez's conviction was affirmed. (ECF No. 8, Exh. 10.) The state appellate court found that Carlos Rodriguez's statement was hearsay that "fail[ed] to comport with any of the exceptions to the hearsay rule listed in Evid. R. 804(B)."  Id. Torrez did not a file a timely appeal with the Supreme Court of Ohio, but did request leave to file a delayed appeal on December 9, 1995. (ECF No. 8, Exhs. 11-12.) On December 13, 1995, Torrez's request was denied. (ECF No. 8, Exh. 13.)

**C. Postconviction Relief and Other State Court Filings**

On July 19, 2005, almost ten years after his direct appeal concluded, Torrez, pro se, filed a petition for post-conviction relief pursuant to O.R.C. § 2953.21(A)(1)(a) & (c). (ECF No. 8, Exh. 14.) In his petition, Torrez claimed that two pieces of evidence confirm that he was the driver of the vehicle on the day of the murder and not the shooter: (1) the statement of Rodriguez, an eyewitness, given the day of the incident that identified Mercado as the shooter; and, (2) a notarized transcription of a recorded conversation that occurred in March of 2001 between the affiant, Fidel Sanchez, and Colton, wherein the latter admitted that Mercado was the shooter.5 Id. Torrez raised the following ground for relief:

Petitioner was denied his Sixth Amendment right to effective assistance of trial counsels [sic] when trial counsel's failure to interview and investigate a eyewitness resulted in the deprivation of his Fourteenth Amendment right to Due Process.

Id. On September 30, 2005, the trial court denied the motion stating that it "failed to set forth substantive grounds for relief." (ECF No. 8, Exh. 17.)

On July 22, 2008, Torrez, pro se, filed a Motion for Relief from Judgment

-6-

pursuant to Ohio Civil Rule 60(B). (ECF No. 8, Exh. 18.) According to Respondent, the trial court has not ruled on this motion. (ECF No. 8 at 10.)

On August 18, 2008, Torrez, pro se, filed a motion for a new trial. (ECF No. 8, Exh. 21.)  On November 6, 2008, Torrez's motion was denied. (ECF No. 8, Exh. 24.) On November 25, 2008, Torrez appealed the denial. (ECF No. 8, Exh. 25.) The appeal was dismissed on February 2, 2009 for failure to file the record. (ECF No. 8, Exh. 26.) On February 12, 2009, Torrez filed a motion for reconsideration which was denied. (ECF No. 8, Exhs. 27 & 28.)

On April 23, 2009, Torrez, pro se, filed a second appeal challenging the trial court's denial of his motion for a new trial. (ECF No. 8, Exhs. 29-30.) On May 11, 2009, the appeal was dismissed sua sponte. (ECF No. 8, Exh. 31.) On July 16, 2009, Torrez, pro se, filed a Notice of Appeal and Motion for Delayed Appeal with the Supreme Court of Ohio. (ECF No. 8, Exhs. 32- 33.) On August 26, 2009, Torrez's motion for leave to file a delayed appeal was denied. (ECF No. 8, Exh. 34.)

D. Federal Habeas Petition

On March 17, 2010, Torrez filed a Petition for Writ of Habeas Corpus asserting the following grounds for relief:

> GROUND ONE: Petitioner was denied his Constitutional rights to fundamental Due Process in violation of the Fourteenth (14th) Amendment to the United States Constitution.
> Supporting Facts: The State deliberately withheld alibi evidence that cleared Petitioner of the offense of Murder, when Petitioner is actually innocent.
>
> GROUND TWO: Petitioner's Due Process was violated when the Trial Court denied his Motion For New Trial Based Upon Newly Discovered Evidence.
>
> GROUND THREE: Petitioner was denied effective assistance of trial counsel in violation of 6th Amendment to the U.S. Constitution.
>
> GROUND FOUR: The conviction of Petitioner is against the Manifest Weight of the Evidence.

(ECF No. 1.)

### III. Summary of the Evidence

**A. Evidence Elicited at Torrez's Trial in 1994**

At Torrez's trial in 1994, the following prosecution witnesses testified: assistant county coroner Robert Challener, M.D., police detectives Samuel Reese and Bonnie Rudolph, and eyewitnesses Deric "Bear" Turner and Miguel Colton. Torrez testified as the sole witness for the defense. Their testimony is summarized below.

Dr. Challener testified that he performed an autopsy on the victim, Brian "Zone" Owens, who had suffered a single gunshot wound to the left part of his chest. (ECF No. 9, Tr. 22, 26, 34.) There was stipling (i.e. burned or partially burned gunpowder) around the entrance wound, indicating that the victim was no more than two feet away from the weapon when he was shot. (Id., Tr. 31-33.)

Detective Reese testified that he investigated the shooting. (ECF No. 9, Tr. 48-50.) A photograph marked as State's Exhibit No. 12 depicted a crutch near the vicinity of the crime.  (Id., Tr. 54-56.) He and Detective Healy spoke to witnesses – Carlos Rodriguez, his mother Nora Rodriguez, and "other people who were there." (Id., Tr. 57.) Detective Reese learned from the Rodriguezes that two males – Alfonso Alicea and Miguel Colton – had been transported to the police station. (Id., Tr. 57-58.) That same day, September 11, 1990, Detective Reese interviewed Alicea and Colton. Id. Within the next few days, written statements were also obtained from them.7 (Id., Tr. 62.) On or about September 12, 1990, Joseph "Chaz" Mercado was arrested. (Id., Tr. 62-64.) Torrez was not located until 1994. (Id., Tr. 64-65, 76.) Detective Reese was unable to locate Alicea in the weeks leading up to Torrez's trial. (Id., Tr. 82.) On cross-examination, Detective Reese indicated that eyewitnesses Colton and Alicea, together with the victim, were members of the same street gang, the Folks. (Id., Tr. 85.)

Detective Rudolph testified that she was with the Scientific Investigation Unit and processed the crime scene on September 11, 1990. (ECF No. 9, Tr. 88-89.) She photographed      the area and searched for trace evidence such as fingerprints or bullet casings, but found nothing worth collecting. (Id., Tr. 91-92.)

Deric "Bear" Turner, during voir dire8 outside the presence of the jury, stated that late in the evening on September 11, 1990, he was inside Bobby Mitchell's house with the victim Owens, Alicea, and Colton when a girl named Kathy told them that Pablo [Torrez] and Chaz [Mercado], whom he identified as rival gang members, were "tagging up the walls" in the  neighborhood (i.e. drawing graffiti on walls with spray paint). (ECF No. 9, Tr. 100-01.)  Afterwards, he, Owens, Alicea, Colton, Mitchell, along with Kathy, went to investigate. (Id., Tr. 101.) Being on crutches caused him to be about eighteen (18) feet behind

-8-

Owens. (Id., Tr. 101- 02.) A car driven by Mercado with Torrez in the passenger seat "shot around the corner." (Id., Tr. 102.) Mercado and Owens began fighting. Id. Mercado tried getting out of the car, but Owens prevented him from doing so. Id. Turner claimed to be standing on the sidewalk with his crutches as the struggle transpired. (Id., Tr. 103.) According to Turner, Alicea told Owens to get away from the car. Id. Torrez began moving around frantically inside the car. Id. He produced a gun and shot Owens. Id. The car separated Owens from his companions so that Owens was on the driver side of the car while Turner, Colton, and Alicea were on the sidewalk facing the passenger side of the car. (Id., Tr. 104.) After Owens was shot, Turner dropped the crutches and carried him to the sidewalk. (Id., Tr. 105.) A "guy named Cope and his mother came outside because it was their driveway." Id. At Alicea's suggestion, Turner got on a bicycle to try to find "some of the fellows and tell them what happened." Id. He was not at the
scene when the police arrived. (Id., Tr. 106.) He never talked to the police despite having the opportunity to do so. (Id., Tr. 106-07.)

On direct examination, Turner testified that he and the victim had both been members of the Folks gang. (ECF No. 9, Tr. 132-33.) He indicated that his nickname was "Bear," but he was no longer affiliated with the gang. (Id., Tr. 134.) He had convictions for attempted grand theft auto and aggravated assault. (Id., Tr. 135.) On the evening of September 11, 1990, he wasat Bobby Mitchell's house with Owens, Alicea, Colton, and Mitchell. (Id., Tr. 136.) He stated that a girl named Kathy came to the house and told them that members of a rival gang were
"tagging up" the neighborhood. (Id., Tr. 137-38.) Afterwards, Turner, Owens, Colton, and Alicea went to look at the building that had been tagged. (Id., Tr. 139.) At that time, Turner had a broken leg and needed crutches to walk. (Id., Tr. 139-40.) As Colton and Owens began crossing the street, a car flew around the corner of Guthrie street. (Id., Tr. 141) Turner was on the sidewalk at that time, but Owens, Colton, and Alicea were in the middle of the street. (Id., Tr. 141-42.) The car separated Owens from Colton and Alicea, so that the latter two were on the same side of the car as Turner, while Owens was on the far side of the car. (Id., Tr. 142-43.)  The car contained two passengers in the front seats. (Id., Tr. 143.) The car was being driven by Chaz [Mercado] with whom Owens began to fight. (Id., Tr. 144.) The driver's side door opened not even a quarter of the way, when Owens pushed the door closed, continuing to hit Mercado.  Id. The passenger, who Turner identified as Pablo [Torrez], began bouncing around in the car, retrieved a gun from the back seat, and shot Owens. (Id., Tr. 144-45.) Turner stated that he got a good look at Torrez firing the gun. (Id., Tr. 145.) Turner positively identified Torrez in the courtroom as the shooter. (Id., Tr. 145-46.) As the car pulled away, Turner embraced Owens and helped him walk to where Alicea was standing in Cubbie's driveway. (Id., Tr. 146-47.) He identified State's Exhibit No. 13 as depicting Cubbie's driveway and a crutch. (Id., Tr. 147.)

-9-

Turner rode away on a bicycle to inform other members of the Folks gang. (Id., Tr. 148.) By the time he returned, only one police car and news media representatives were present at the scene. (Id., Tr. 149.)

On cross-examination, Turner stated that he was no longer a gang member, but had been one for seven or eight years before the shooting. (ECF No. 9, Tr. 163, 167.) According to Turner, one night prior to Owens's death, Torrez and another rival gang member called Chaos fired shots at Owens, Alicea, and Colton while he was waiting for a bus. (Id., Tr. 170.) Turner knew who the shooters were because the others identified them for him and said "there go Chaos and Pablo." (Id., Tr. 171.) Turner stated that he has never heard the name Carlos Rodriguez, but on re-cross examination indicated that he knew a person nicknamed Cubbie. (Id., Tr. 172, 214.) At the time of the shooting, Turner testified that Torrez did not have a full beard, was wearing a hat, had frosted or dyed some of his hair, had longer hair than at trial, and "had more meat on his bones." (Id., Tr. 174-75.) He and the others did not throw rocks at the car and did not have any weapons with them during the encounter. (Id., Tr. 185-86.) He did not see Torrez's face completely until after the car pulled away and Torrez looked back out of the window. (Id., Tr. 188, 195.) At the time, he did not know what Torrez looked like, but Alicea and Colton did. (Id., Tr. 199.) He never identified Torrez as the shooter to the police. (Id., Tr. 201.)

Miguel Colton testified that he and the victim were members of the Folks gang. (ECF No. 9, Tr. 223.) On September 11, 1990, he was at the house of a fellow gang member, whom he only knew as "Dread," lifting weights with Bear [Turner], Owens, and Alicea. (Id., Tr. 224- 26.) A woman named Kathy told them that Pablo [Torrez] and Chaz [Mercado] were tagging walls just down the street. (Id., Tr. 226.) Colton had heard their names before, but did not know what they looked like.9 (Id., Tr. 226-27.) Colton said that he, Alicea, Turner, and Owens decided to go down the street to "check it out." (Id., Tr. 227.) They were walking down the middle of the street, and he saw Torrez and Mercado finish their tagging and disappear from view. (Id., Tr. 228.) Afterwards, the two individuals shot around the corner of Guthrie in a burgundy Celebrity. (Id., Tr. 229-30.) Colton thought that the car was going to run them over. (Id., Tr. 230-31.) He said he was in the street with Owens and Alicea, while Turner, who was on crutches, was "still coming." (Id., Tr. 231.) The car stopped between them in front of Carlos's ("Cubbie") house. (Id., Tr. 232.) Colton and Alicea went towards Torrez's side of the car while Owens went towards the driver's side and Mercado. (Id., Tr. 232-33.) Colton observed Mercado and Owens fighting through the open window of the car, while he threw a rock into the passenger side of the car. (Id., Tr. 233-34.) Colton then observed Torrez turn around and start looking for something in the back seat. (Id., Tr. 234.) Colton heard Alicea exclaim "look out, he is looking for a gun." Id. Colton said Torrez placed the gun against Owens's chest and fired once. Id. The car was then driven away. (Id., Tr. 234-35.) Colton saw Owens staggering; Turner helped Owens towards Cubbie's driveway into

-10-

Alicea's arms. (Id., Tr. 235.) Colton identified Torrez as the person he saw looking at him through the passenger side window. (Id., Tr. 236.)

Thereafter, the police came and an ambulance transported Owens to the hospital. (Id., Tr. 237.) Colton and Alicea were taken to the police station where they made statements. Id.  Colton identified Torrez and Mercado simply as "Pablo and Chaz," not knowing their last names. (Id., Tr. 238.) Colton described Torrez as having frosted hair that was longer in the back, standing 5'6" tall, and weighing approximately 140 pounds. (Id., Tr. 239.) He described Torrez as being smaller at trial than at the time of the shooting. Id. After the incident, Colton examined the graffiti left by Torrez and Mercado. (Id., Tr. 240-43.) According to Colton, the graffiti contained gang symbols associated with the Kings, the names of Pablo and Chaz, and the letters F and K, which he interpreted as meaning "Folks killers." Id.

On cross-examination, Colton stated that he went to Turner's house to ask him to testify at trial. (ECF No. 9., Tr. 253-55.) He stated that Turner was at the scene of the shooting, but was approximately 25 feet behind. (Id., Tr. 252-53.) The driver was not trying to exit the vehicle. (Id., Tr. 259.) Colton threw two rocks at the car, one before the passenger retrieved the gun. (Id., Tr. 260-62.) Nobody else threw things at the car. (Id., Tr. 263.) Alicea had a broken leg and was wearing a brace. (Id., Tr. 263-64.) Colton identified "Cubbie" as Carlos Rodriguez.  (Id., Tr. 266.) He said Rodriguez was not a gang member and described him as a "good boy."  Id. Colton said that he could not dispute his written statement that said Rodriguez was present at the time of the shooting, but at trial he could not remember whether Rodriguez was there. (Id., Tr. 266-67.) When he heard Alicea say the passenger was looking for a gun, he turned and ran. (Id., Tr. 277-78.) Although Colton maintained that he had seen Torrez once before the incident, he agreed that his statement to police indicated that he had never seen him before. (Id., Tr. 279- 80.)

Pablo Torrez, the Petitioner herein, testified that he was a member of the Rice and Beans gang. (ECF No. 9, Tr. 316.) On September 11, 1990, Mercado picked him up around noon in a burgundy Chevrolet Celebrity. (Id., Tr. 317-19.) Torrez stated that he did not have frosted or dyed hair at that time. (Id., Tr. 322-23.) Mercado and Torrez picked up 8 to 10 cans of spray paint and proceeded to the area of Madion Avenue and West 81st Street. (Id., Tr. 323, 329.)  Torrez stated that he was going to "tag up" some walls as part of his initiation into the Kings.  (Id., Tr. 321, 323-24.) They stopped at more than twenty places to spray paint. (Id., Tr. 348.)  He claimed that it was Mercado who chose the neighborhood and the wall where they spray painted graffiti. (Id., Tr. 324-25.) Torrez conceded that Exhibits 17 and 18 depicted graffiti that he had drawn, but denied the letters F and K was a threat to the Folks gang. (Id., Tr. 324-25.) Torrez testified that the F and K stood for "fool Kings."[10] (Id., Tr. 325.) Afterwards, Mercado began tagging a school wall while Torrez waited in the car in the driver's seat. (Id., Tr. 327.)  Torrez stated that when one of them was painting the other one would

-11-

always be in the driver's seat. (Id., Tr. 348-49.) When they left the school, Torrez
indicated that he was driving. (Id., Tr. 329.) He stated that when he rounded the
corner on Guthrie, a number of people popped out from behind parked cars and
started throwing bricks at the car. (Id., Tr. 330-31.) He did not know any of the
people who were throwing bricks at the car, but Mercado told him that they
were members of the Folks gang. (Id., Tr. 343-44.) He accelerated the car when
bricks began hitting the vehicle, but he denied trying to hit anyone. (Id., Tr.
332-33.) While accelerating, Torrez stated that he looked into the rear-view
mirror and saw Mercado lean into the back seat with his left hand and pulled out a
gun.11 (Id., Tr. 333-34.) Afterwards, as Torrez accelerated, Mercado "popped a
shot" which he only heard but did not see. (Id., Tr. 334-35.) Immediately after the
shot, Torrez saw the gun pointing towards the back window on the driver's side
of the car. (Id., Tr. 336-37.) When Torrez asked Mercado what he did, Mercado
responded that he grabbed a gun from under the speaker box and "shot him." (Id.,
Tr. 338.) Torrez, however, did not see anyone get hit. Id. Torrez testified that
there was no fighting or punching going on between Mercado and anyone outside
of the car. The two exchanged places a little further up the street and Mercado
took over driving. (Id., Tr. 338.) They "went back" to Mark Greene's house
where Mercado returned the gun used in the shooting to Green, as it belonged to
him. (Id., Tr.
338-39.) Thereafter, the pair drove to Mercado's house. (Id., Tr. 339.) Torrez
stated that Mercado would not let him go home. Id. Mercado called some friends
who helped strip the column of the car to make it appear as if it had been stolen.
(Id., Tr. 339-40.) Torrez claims he did not participate in that activity. Id. Torrez
fled to New Jersey two days later because he was afraid of Mercado and his
family. (Id., Tr. 341-42.) Torrez stated that he did not fire the gun that killed
Owens and had no advance knowledge that Mercado was going to do so. (Id., Tr.
346.) Although Torrez was not told there was a gun in the car, he did know
Mercado sometimes carried a weapon. Id. Before the shooting, while Torrez and
Mercado were at Mark Greene's house, Torrez heard Greene and Mercado talking
about a gun. (Id., Tr. 347-48.) Torrez told Mercado that he was getting back in the
car if there was a weapon on him. (Id., Tr. 348.) Torrez also stated that he did not
see a gun in the car on the day in question. Id. Torrez further testified that he did
not know of anyone named Carlos Rodriguez or Cubbie. (Id., Tr. 350.)

On cross-examination, Torrez testified to the following. He was initially a
member of a group or gang called the Latin Rascals. (ECF No. 9, Tr. 354-55.)
The name was later switched to the Rice and Beans. (Id., Tr. 355-58.) There were
six members, including Jose Nieves, Joseph Mercado, Louis Torrez, Richard
Santiago, and a person known as Chaos. Id. The Kings gang was composed of the
older people who had "climbed the ladder" from the Rice and Beans.  (Id., Tr.
358.) At the time of the shooting, there were three members of the Kings: Edgar
Hernandez, Miguel Torrez, and Joseph Mercado. (Id., Tr. 360.) He was driving
approximately fifteen miles per hour when Mercado fired the gun. (Id., Tr. 389,
392.) He did not see where Owens was standing when the shot was fired.12 (Id.,

Tr. 389-90.) Upon returning to Mark Greene's house, Torrez got into an argument with both Mercado and Greene over the shooting. (Id., Tr. 394-95.) Torrez thought that Mercado went inside Mark Greene's house to report the car stolen. (Id., Tr. 396.) Torrez left his mother's house after she told him that police detectives had been there. (Id., Tr. 397.) When asked why he did not help the police in their investigation of Mercado, Torrez responded that he "wasn't going to be called a snitch." (Id., Tr. 398.)

**B. Evidence Elicited at the Evidentiary Hearing**

At the evidentiary hearing held on July 21 and 22, 2011, the following individuals testified:  Joseph Mercado, Fidel Sanchez, Alfonso Alicea, Deric Turner, Carlos Rodriguez, Mark Greene, Nestor Martinez, Rita Morales, Carlos Rodriguez, Arturo Ramos, Jr., Elena Ramos, Edgar Hernandez, Jaci Torres, assistant county prosecutor Richard Bombik, and investigator Michael O'Malley. The relevant testimony is summarized below.

<u>Joseph Mercado</u> testified that he was not in court voluntarily, but only because a subpoena was issued by Torrez's counsel. (ECF No. 83, Tr. 129.) He was Torrez's co-defendant in the homicide of Owens. (Id., Tr. 132.) In connection with that case, he accepted a plea agreement resulting in a voluntary manslaughter conviction with a gun specification. Id. When asked why he did so, Mercado indicated that he was, in fact, guilty. Id. He received a sentence of eight to twenty-five years, of which he served nine. (Id., Tr. 132-33.) At the time of the shooting, he was known by the nickname "Chaz." (Id., Tr. 134.) Nobody from the police department or the prosecutor's office asked him for his statement after he pled guilty. (Id., Tr. 133.) He knew Torrez through their mutual membership in the Rice and Beans gang. (Id., Tr. 135.) He was in the car, as the passenger, with Torrez driving when Owens was shot. (Id., Tr. 135-36.) In fact, Mercado expressly testified that he was the one who shot Owens. (Id., Tr. 136.) Mercado stated that he was tagging a building when somebody began yelling at him, so he jumped in the car and Torrez drove away. (Id., Tr. 137.) When they reached the end of the street, Mercado heard Torrez yell "Folks." Id. Mercado heard the car being hit by bricks, and it was being punched and kicked. Id. Mercado retrieved a small caliber gun from the back seat with the intent to scare the person who was near the car. (Id., Tr. 137-38.) However, instead the person was shot. (Id., Tr. 138.) Mercado stated that when they drove down the street, it was not his intent to kill anyone. Id. Afterwards, Mercado reported the car stolen and dumped it on Train Avenue with the intent to conceal what he did. Id. He also filed a police report. Id. He indicated that he had nothing to gain from testifying, and, after speaking with his attorney, neither did he believe he had anything to lose. (Id., Tr. 138-39.) Mercado stated that Torrez did not know there was going to be a shooting that day, as Mercado did not anticipate doing it. (Id., Tr. 139.) He turned himself in to the police on September 12, 1990, after his mother encouraged him to do so. (Id., Tr. 139, 141.)

-13-

On cross-examination, Mercado said he did not "take the fall" for the shooting, but was, in fact, guilty. (ECF No. 83, Tr. 140.) He did not tell anyone that he was the shooter. (Id., Tr. 142.) He did not feel that Torrez took the fall for him, because, the way the prosecution explained it to him, Torrez was just as guilty even if he was not the actual shooter. (Id., Tr. 142-43.) Mercado stated that he was not present in court to do "a right thing or a wrong thing," but that he was there because of a subpoena. (Id., Tr. 143.) On the day in question, he and Torrez spray painted graffiti in the West Tech area. (Id., Tr. 144.) He does not recall if he went to Mark Greene's house that day, but indicated that he used to "hang out with Mark Greene a lot."  Id. He did not recall if they tagged twenty places, but indicated that they did vandalize a lot of properties. (Id., Tr. 145.) Mercado also could not recall whether he gave the gun back to Mark Greene after the shooting, but specifically denied giving the gun to his mother. (Id., Tr. 145-46.)  After the shooting, Mercado testified that he and Torrez split up. (Id., Tr. 146.) He denied making any threats toward Torrez. Id. When asked why it took so long for him to come forward, Mercado indicated that "[i]f you never subpoenaed me, you would never have seen me." (Id., Tr. 147.) He does not remember if he ever told Torrez that he had a gun that day or whether he procured the gun from Mark Greene. (Id., Tr. 147-48.) He indicated that it was his assumption that he could not return to prison for Owens's death. (Id., Tr. 148.)

Fidel Sanchez, whose prior criminal record was admitted as Petitioner's Exhibit B, testified that he knew Torrez from their joint stint at the Madison Correctional Institution sometime between 1994 and 2000. (ECF No. 83, Tr. 11, 14.) Torrez would break down and cry on a weekly basis claiming that he was in prison for something he did not do. (Id., Tr. 15.) While at Richland Correctional Institute, Sanchez overheard another inmate named Colton, whom he only knew by his surname, talking about Torrez's case. (Id., Tr. 15-16.) After Sanchez was transferred to Lake Erie Correctional Institute ("LECI"), he again met Colton in 2002 or 2003 and tape recorded a conversation regarding Torrez's case.13 (Id., Tr. 17.) Sanchez stated that he approached Colton and asked him if he wanted to play dominoes. (Id., Tr. 19.) When Colton responded in the affirmative, Sanchez retrieved the dominoes and the cassette player/recorder from his dormitory. (Id., Tr. 19.) Sanchez testified that Petitioner's Exhibit A contains the recording that he made of his conversation with Colton. (Id., Tr. 21.)

MUSIC STOPPED –

Mr. Colton-    What's up with the music?
Mr. Sanchez-   I'm rewinding it right now, dog.

Mr. Colton-    What about Richland you said?

Mr. Sanchez-   Remember you was telling to me about that dude

-14-

Chaz and Pablo in Richland?

Mr. Colton-    Yeah, yeah.

Mr. Sanchez-   Well yesterday I called my cousin, man, and he was
               home with some dude Chaz that got out of jail a few
               years ago, man.

Mr. Colton-    Yeah, that's the same Chaz who shot my dude
               Zone. You know that car I was talking about, that
               red Chevy? Pablo was driving that day.

Mr. Sanchez-   Well, I don't want my people around that dude.
               Mr. Colton - Yeah, I don't blame you dog.

Mr. Sanchez-   I thought, I thought you had to go to court, man?

Mr. Colton-    I did, I did, but that's where, that's where
               everything got all twisted up.

Mr. Sanchez-   Oh yeah?

Mr. Colton-    Yeah, because me and Bear, who came with me,
               knew Pablo was the driver, he knew he was the
               driver and shit.
               The Prosecutor said, that um, that he wasn't going
               to help that much. So you know, so we just left it
               the way it was.

Mr. Sanchez-   Man, that's crazy how that turned out man.

Mr. Colton-    What's more crazy is that I had to tell Bear
               everything because he didn't see shit.

Mr. Sanchez-   Damn!

Mr. Colton-    That's crazy huh?

Mr. Sanchez-   Yeah, its on you now man, ---- MUSIC CONT.

(Petitioner's Exh. A.)  Though Sanchez appeared somewhat confused on this
point, he testified that he had sent the recording to his sister and told Torrez about
it. (ECF No. 83, Tr. 22-23.)  Sanchez testified that he made the recording on his
own, and not at anyone's behest. (Id., Tr. 28.)
        On cross-examination, Sanchez stated that the affidavit he signed
indicated that the recorded conversation took place in March of 2001, and that his

-15-

recollection was better back then than it is now. (ECF No. 83, Tr. 35-36.) Sanchez did not recall how much later he told Torrez about the conversation. (Id., Tr. 37.) Nor could he recall why he waited until 2005 to prepare the affidavit.15 (Id., Tr. 43.)

Nestor Martinez, Petitioner Torrez's brother, also testified at the evidentiary hearing. (ECF No. 83, Tr. 100.) Although he knew Fidel Sanchez from prison, he learned about the aforementioned tape recording from his brother – not from Sanchez. (Id., Tr. 101-102.) When Martinez was released from prison in 2003, Torrez asked him to retrieve the tape recording from the Sanchez family. (Id., Tr. 102.) In late 2003, Martinez stated that he went to see the Sanchez family, but he could not find anyone with knowledge of the tape. (Id., Tr. 103.) Later, he was informed that the tape had been destroyed. (Id., Tr. 103-04.) Sometime in 2005, a woman named Bagi, who he believed to be Sanchez's sister, brought him a tape recording. (Id., Tr. 104-06.) After listening to the tape, he recognized the voices of Colton and Sanchez. (Id., Tr. 105.) He told Torrez that he had the tape in his possession both by letter and telephone. (Id., Tr. 105-07.) He played the tape for Torrez and sent him a transcript. Id. He held onto the tape until he
was again incarcerated, at which time he gave the tape to his fiancé, Melissa. (Id., Tr. 107-08.) Martinez instructed his fiancé to provide the tape to Jaci Torres. (Id., Tr. 108.) She, in turn, gave it to Jaci Torres after a few months. (Id., Tr. 110-13.) He never provided the police or any court with a copy of the tape. Id.

Jacinta "Jaci" Torres testified that she knew Torrez's mother for over ten years through her work as a patient advocate. (ECF No. 83, Tr. 236-37.) After learning that Torrez was incarcerated, Ms. Torres began writing Torrez. (Id., Tr. 238.) They became pen pals. Id. At one point within the past year, Torrez asked Ms. Torres to retrieve an envelope from Nestor Martinez's house. Id. She picked up the envelope and provided it to Torrez's counsel. (Id., Tr. 239.) She never examined the contents. Id.

Carlos Rodriguez, the only eyewitness not affiliated with either gang, testified as follows. On September 11, 1990, he witnessed the shooting and gave a statement to police. (ECF No. 83, Tr. 175.) He identified his statement given to police, Petitioner's Exhibit FF, wherein he stated that (1) Mercado shot Owens, and (2) Alfonso Alicea and Miguel Colton were also present at the time of the shooting.16 (Id., Tr. 178-79.) He identified Mercado as the shooter after being shown a photograph. (Id., Tr. 176, 179.) Furthermore, at that point in time, he had known Mercado and his family for at least three years. (Id., Tr. 179, 182.) Conversely, he had only known Torrez for a short time, and only as Pablo. (Id., Tr. 180.) He received threats after he spoke to the police. (Id., Tr. 177.) He was not living in Cleveland at the time of Torrez's trial in 1994. (Id., Tr. 177-78.)

On cross-examination, Rodriguez stated that he had friends who were members of the Folks gang, including Alicea, Colton, and Owens. (ECF No. 83,

Tr. 182.) He had initially trusted Alicea – and Colton for a short time – but found them to be "deceiving." (Id., Tr. 183.) He had taken the trash out and began talking to Owens, Colton, and Alicea when he heard a loud "[car stereo] system" thumping. (Id., Tr. 183-84.) The others said "[h]ere they come." Id. After the incident, he was threatened by Mercado's brother. (Id., Tr. 186.) He was apprehensive about testifying at the evidentiary hearing due to one of Torrez's cousins speaking to him about the case in March of 2011. (Id., Tr. 187.)

Deric "Bear" Turner testified at the evidentiary hearing by video conference from North Carolina. Immediately prior to the shooting of Owens, Turner was lifting weights at Bobby "Dredd" Mitchell's house. (ECF No. 84, Tr. 264.) Also present were Owens, Alicea, and Colton. Id. They were told that someone was tagging in their neighborhood. (Id., Tr. 265.) He, along with Owens, Colton, and Alicea, went to investigate, but saw nothing. Id. A couple of minutes later, a car came flying around the corner. Id. The car was occupied by Torrez and Mercado. Id. He was standing on the sidewalk when the car stopped. (Id., Tr. 269.) Turner stated that he was familiar with both Torrez and Mercado. Id. He had known Mercado for about four to five years, and Torrez for about a year or two. (Id., Tr. 265-66.) Turner stated that Owens began fighting with Mercado, and Torrez reached over Mercado and shot Owens. (Id., Tr. 266.) Torrez and Mercado drove away. Id. Turner helped carry Owens to the curb and laid him down in Alicea's arms. Id. Turner rode his bike to go get help and when he returned, nobody was at the scene. Id. He had not witnessed any prior confrontations between Owens and Mercado. (Id., Tr. 267.) Turner denied being coached by Colton to testify a certain way at Torrez's trial. (Id., Tr. 268.)

On cross-examination, Turner testified that he was 21 years old at the time of the shooting and had already been a member of the Folks gang for seven or eight years. (ECF No. 84, Tr. 270.) He had been a loyal gang member, and felt some loyalty to other gang members at the time of his testimony in 1994. Id. Turner indicated that he was not subpoenaed to appear at Torrez's trial, but testified after Colton asked him to do so. (Id., Tr. 271.) He denied that Colton coached him. He stated that he was separated from the other witnesses when they arrived at the courthouse. Id. Turner testified that he does not believe Colton any more because he "flipped from Folk to King" some time after Torrez's trial. (Id., Tr. 274-75.) Turner stated that there was nobody on the street when they left the house, and that if Colton testified otherwise, he was mistaken. (Id., Tr. 276.) At the time of the shooting he was on crutches and had a cast on his foot. (Id., Tr. 277.) Turner denied that he was too far away from the shooting to see anything. Id. He knew Carlos "Cubby" Rodriguez and believes that Rodriguez was there at the time of the shooting. (Id., Tr. 281.) After Torrez's counsel pointed out that Turner, at trial, testified that Rodriguez was not at the shooting, Turner testified that he could have been mistaken, as his focus was not on who was around, but on Mercado and Torrez – the Kings. (Id., Tr. 281-82.) Turner also testified that he did not see Colton throw any rocks at the car. (Id., Tr. 288.) He testified that he

-17-

was not on the same side of the car as Colton, but on the driver's side of the car with Owens. (Id., Tr. 289.) Turner stated that he could see the occupants of the car through car windows while Owens was hitting Mercado. (Id., Tr. 290.) He stated that he recognized Torrez's face, but that he could not give a name until Colton or Alicea told him. (Id., Tr. 295.)

Alfonso Alicea testified at the evidentiary hearing as follows. The day Owens was shot and killed, he was working out at Bobby's house with Bear [Turner], Baby Face [Colton], and a couple of other guys. (ECF No. 84, Tr. 319-20.) He was a member of the Folks gang. (Id., Tr. 324.) They left the house because a couple of the girls from the neighborhood told them that someone was "tagging on our corner." (Id., Tr. 320.) They walked towards the two men, who, in turn drove towards them. Id. When the car stopped, Owens began yelling at the driver and a fight ensued. (Id., Tr. 321.) Owens reached into the car punching the driver, who tried to fight him off. Id. The passenger began panicking, reached down between the seats, and came up with a pistol. (Id., Tr. 321.) Alicea stated that the passenger looked at him, smiled, and then reached over the driver's side and shot Owens. Id. Alicea identified Torrez as the passenger and shooter. Id. Alicea testified that the passenger was skinny and little while the driver was bigger. (Id., Tr. 321-22.) He testified that Torrez looked back at him, laughed, and the car drove away slowly. (Id., Tr. 322.) Alicea testified that Owens walked towards him and collapsed in his arms. Id. He was familiar with both Mercado and Torrez prior to the shooting. (Id., Tr. 324.) He spoke to police officers who arrived at the scene of the crime. (Id., Tr. 322.) Alicea identified Respondent's Exhibits 9a and 9b as statements bearing his signature. (Id., Tr. 323-24.) He did not receive a subpoena for Torrez's trial in 1994. (Id., Tr. 328.)

On cross-examination, Alicea testified that neither Colton nor Turner were with him walking down the street. (ECF No. 84, Tr. 329-30.) Moreover, neither Colton nor Turner were there when the car came down the street. (Id., Tr. 330.) Alicea stated that Turner was "probably walking down the street" when Owens began hitting the driver. (Id., Tr. 330.) At the time Owens was shot, Alicea was standing on the passenger side of the car, but "people were coming from everywhere." (Id., Tr. 331-32.) When asked if Turner would be lying if he claimed to be the one that caught Owens after he was shot, Alicea responded "yes." (Id., Tr. 335-36.) Though the statement Alicea gave to police indicated that Chaz [Mercado] and another person called Kaos fired shots at him and Owens a few months earlier, Alicea had no recollection of the incident. (Id., Tr. 338-39.) He testified, however, that he would have been truthful when making the statement. Id.

Mark Greene testified that prior to being incarcerated in 1991, he lived at 2148 West 21st Street. (ECF No. 83, Tr. 158.) He was familiar with Mercado, but barely knew Torrez. (Id., Tr. 158-59.) He saw both Mercado and Torrez on the day Owens was shot. (Id., Tr. 160.) Greene stated that on that day Mercado drove

to his house with Torrez, and Mercado asked him for a weapon. Id. Torrez, however, was not in the house when Greene gave Mercado the gun. (Id., Tr. 160, 165.) Mercado returned the weapon later that day. (Id., Tr. 160.) Greene stated that Mercado was "shooken up; frightened" when he returned and indicated that somebody was shot.  (Id., Tr. 161.) Greene stated that he could not remember what Mercado said verbatim, but the way he understood it was that Mercado was the shooter. Id. Torrez was also shaken up, but not as badly as Mercado. Id. Greene took the gun back from Mercado, and held onto it for a day or two until members of Mercado's family asked for it. (Id., Tr. 161-62.) He gave them the gun.  (Id., Tr. 162.) He was also planning on providing a false alibi for Mercado out of loyalty and friendship.  Id. Greene also testified that Mercado had telephoned the police to report that his car was stolen, despite the fact that the car was parked outside. (Id., Tr. 163.)

On cross-examination, Greene testified that he could not remember whether he gave Torrez eight to ten cans of spray paint that day, but conceded it was possible. (ECF No. 83, Tr. 165-66.)  He did not recall whether Torrez argued with Mercado and him after the shooting. (Id., Tr. 167.)  He did recall Mercado wanting him to report the car as stolen. Id.

Rita Morales, Torrez's mother, testified with the help of an interpreter. Some time after the shooting of Owens, she heard Mercado say "I killed him." (ECF No. 83, Tr. 153.) She did not report this information to the police. Id. After the shooting, rocks were thrown at her house, but she did not know by whom. Id. She attempted to speak with Carlos Rodriguez after the shooting, but Rodriguez's mother would not allow it. (Id., Tr. 154.)

Arturo Ramos, Jr. testified that he was no more than twelve years old at the time of the shooting. (ECF No. 83, Tr. 190-91.) He had known Torrez and Mercado for a long time. Id. He described Torrez as a brother to him. Id. He remembers Mercado jumping around in his driveway claiming that he shot him (Owens). (Id., Tr. 192-93.) After that, Ramos said his mother grabbed him and took him inside. Id.

Elena Ramos, mother of Arturo Ramos, testified that she has known Torrez all his life.  (ECF No. 83, Tr. 197.) Her children and Torrez played together. Id. She also knew the Mercado family. Id. Around the time of the shooting, she heard Mercado saying "I shot him. I think I killed him." (Id., Tr. 197-98.) She grabbed her son Arturo, took him inside the house, and locked all the doors. Id. She never told anyone what Mercado said. (Id., Tr. 198.) She had a special relationship with Mercado, who would confide in her. (Id., Tr. 201.)

On cross-examination, Ramos stated that she loved Torrez like a son. (ECF No. 83, Tr. 199.) She never spoke to police because she was afraid and did not know what to do. (Id., Tr. 199-200.) Nobody asked her to come forward in 1994 when Torrez was being tried. (Id., Tr. 200.)

Edgar Hernandez, brother of Arturo Ramos and son of Elena Ramos, testified that he grew up with Torrez and that they were very close. (ECF No. 83, Tr. 204.) They were both members of the Rice and Beans, though he did not consider it a gang as there were only five to ten members. (Id., Tr. 205.) He knew Mercado, but was closer to Torrez. Id. He went to Torrez's house after learning of the shooting, where he encountered both Torrez and Mercado. (Id., Tr. 207.) Hernandez heard Mercado say "I shot him. I think he's dead." (Id., Tr. 208.) Afterwards, he heard Mercado say he had to strip the column of the car and report it stolen. Id. He and Torrez followed Mercado, who drove his car, on their bikes to Train Avenue. (Id., Tr. 209.)  Mercado began peeling the column of his car while he and Torrez stayed and watched for the police. (Id., Tr. 209-10.) He never told the police what he heard Mercado say because he felt intimidated by law enforcement. (Id., Tr. 212-13.) Hernandez stated that after Torrez's trial, at which he believed Mercado testified against Torrez, he told friends that Mercado was the shooter. (Id., Tr. 213-14.) Thereafter, Hernandez testified that Mercado's brother, Benny, along with some others, kidnapped him at gunpoint and told him to keep his mouth shut. (Id., Tr. 214-16.)

On August 19, 2010, Warden Richard Gansheimer ("Respondent") filed a Motion to Dismiss the Habeas Petition as Time-Barred. (Docket #8.)  On October 13, 2010, Torrez filed a response asserting actual innocence. (Docket #14.) The Magistrate Judge appointed the Federal Public Defender to represent Torrez. (Docket #15.)  On January 20, 2011, oral arguments concerning Respondent's motion to dismiss the petition as time-barred were heard.  The same day, the Magistrate Judge granted Torrez's previously filed Motion for an Evidentiary Hearing." After some limited discovery, the Magistrate Judge held an evidentiary hearing on July 21 and 22, 2011.  (Docket #s 71 and 73.)

On October 27, 2001, the Magistrate Judge issued his Report and Recommendation. (Docket #89.)  The Magistrate Judge recommends that the Motion to Dismiss filed by Respondent be granted and the Petition be dismissed as untimely.  The Magistrate Judge determined that the Petition was filed beyond the one-year statute of limitations set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 22544(d)(1)(A).  The Magistrate Judge concluded that neither statutory nor equitable tolling is available to save Torrez's Petition.  The Magistrate Judge determined that while there may be

-20-

new and reliable evidence, when considering all the evidence of record, a reasonable juror would have convicted the defendant even had the evidence been presented. *Schlup v. Delo*, 513 U.S. 298 (1998).

On November 10, 2011, Petitioner filed his Objections to Report and Recommendation. (Docket #90.) Petitioner asks the Court to find that he has demonstrated a credible claim of actual innocence and, through the application of equitable tolling principles set forth in *Schlup v. Delo*, 513 U.S. 298 (1998), may litigate the merits of his Habeas Petition. In the alternative, Petitioner asks the Court find his Petition timely based upon his State court Post-Conviction Petition and Motion for Relief From Judgment.

On November 28, 2011, Respondent filed his Response to Petitioner's Objections. (Docket #91.) Respondent states that Petitioner's objections are without merit and simply restate arguments that have already been raised and rejected by the Magistrate Judge. Respondent argues that Petitioner failed to satisfy the two-part inquiry required by *Schlup*. Respondent disagrees with the Magistrate Judge's conclusion that the evidence presented was "new" because it was available at trial, and discusses in detail the reasons why the "new" evidence is not reliable. Respondent agrees with the Magistrate Judge's determination that Petitioner failed to demonstrate that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence. Respondent notes that three witnesses identified Petitioner as the shooter and the testimony of the eyewitnesses is corroborated by the testimony of the investigating police officers; by the autopsy report; and, by the photographs introduced into evidence.

### Standard of Review for a Magistrate Judge's Report and Recommendation

The applicable standard of review for a magistrate judge's report and recommendation depends upon whether objections were made to that report. When objections are made to a

report and recommendation of a magistrate judge, the district court reviews the case de novo.

FED. R. CIV. P. 72(b) states:

> The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.  The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

### Conclusion

This Court has reviewed the Magistrate Judge's Report and Recommendation *de novo,* considering the Objections of Petitioner and Respondent's Response thereto.  The Magistrate Judge thoroughly examined the Record in this case, and presents a well-reasoned and accurate discussion of the factual and procedural history of this case and a detailed analysis of the applicable law.  The objections raised by Petitioner restate arguments already presented to and examined by the Magistrate Judge.  After careful evaluation of the Record, this Court adopts the findings of fact and conclusions of law of the Magistrate Judge as its own.   The Court hereby ADOPTS the Report and Recommendation of the Magistrate Judge (Docket #89) in its entirety.

Respondent's Motion to Dismiss the Habeas Petition as Time-Barred (Docket # 8) is GRANTED.  The Petition for Writ of Habeas Corpus (Docket #1) is DISMISSED WITH PREJUDICE.

Petitioner's Motion to Strike (Docket #92) is DENIED.

Petitioner's Motion to Stay Proceedings and Hold Case in Abeyance (Docket #95) is DENIED.

### Certificate of Appealability

Pursuant to 28 U.S.C. § 2253, the Court must determine whether to grant a certificate of appealability as to any of the claims presented in the Petition.  28 U.S.C. § 2253 provides, in part, as follows:

(c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from --

(A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or

(B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.
(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

In order to make "substantial showing" of the denial of a constitutional right, as required under 28 U.S.C. § 2255(c)(2), a habeas prisoner must demonstrate "that reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n.4, 103 S. Ct. 3383, 77 L. Ed. 2d 1090 (1983).)

Where a district court has rejected the constitutional claims on the merits, the petitioner must demonstrate only that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong. *Slack*, 529 U.S. at 484. Where the petition has been denied on a procedural ground without reaching the underlying constitutional claims, the court must find that the petitioner has demonstrated that reasonable jurists could debate whether the petition states a valid claim of the denial of a constitutional right *and* that reasonable jurists could debate whether the district court was correct in its procedural ruling. *Id.* "Where a plain procedural bar is present and the district court is correct to invoke it to dispose of the case, a reasonable jurist could not conclude either that the district court erred in dismissing the petition or that the petitioner should be allowed to proceed further." *Id.*

For the reasons stated in the Magistrate Judge's Report and Recommendation, a

reasonable jurist could not conclude that dismissal of the Petition is in error or that Petitioner should be permitted to proceed further.  Accordingly, the Court declines to issue a certificate of appealability.

IT IS SO ORDERED.

s/Donald C. Nugent
DONALD C. NUGENT
United States District Judge

DATED: May 23, 2012